**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| VIZIO, INC., <br>       Plaintiff, <br><br>       v. <br><br> ROBERT KLEE, in his official capacity as the <br> Commissioner of the State of Connecticut <br> Department of Energy and Environmental <br> Protection, <br>       Defendant. | No. 3:15-cv-00929 (VAB) |

**RULING ON MOTION TO DISMISS [Doc. No. 21]**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................. 2

III. STANDARD OF REVIEW .................................................................................... 6

IV.  DISCUSSION ........................................................................................................ 8

   A.   THE COMMERCE CLAUSE CLAIMS ........................................................ 8

     1.   The General Dormant Commerce Clause Claim ..................................... 9

       a.   Discriminatory Burdens Analysis ................................................. 9

       b.   Extraterritoriality ........................................................................ 15

         i.   Out-of-State Pricing .......................................................... 16

         ii.  Out-of-State Transactions ................................................. 21

       c.   Conclusion .................................................................................. 27

     2.   User Fee Claim under the Commerce Clause ....................................... 27

   B.   TAKINGS CLAIMS ...................................................................................... 30

   C.   EQUAL PROTECTION CLAIMS ............................................................... 34

     1.   Television Manufacturers Versus Other CED Manufacturers ................... 35

     2.   New Versus Old Television Manufacturers ............................................. 37

     3.   Television Manufacturers Versus Non-CED Manufacturers ..................... 40

     4.   Conclusion ............................................................................................... 41

   D.   SUBSTANTIVE DUE PROCESS CLAIMS ................................................ 42

     1.   Existence of Retroactive Provisions ....................................................... 44

     2.   Rational Basis Review ............................................................................. 45

     3.   Conclusion ............................................................................................... 49

V.   CONCLUSION .................................................................................................... 50

## I.      INTRODUCTION

On June 17, 2015, VIZIO, Inc., a California-based television brand-owned seller, filed a complaint (the "Complaint") [Doc. No. 1] challenging the constitutionality of Connecticut's "E-waste Law."  Plaintiff VIZIO seeks the following declaratory and injunctive relief: a declaration that the law is unconstitutional under the Commerce Clause of the United States Constitution; a declaration that the law is unconstitutional under the Takings Clause of the Fifth Amendment of the United States Constitution and under Article I, Section 11 of the Connecticut Constitution; a declaration that the law is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and under Article I, Section 20 of the Connecticut Constitution; a declaration that the law violates VIZIO's due process rights under the Fourteenth Amendment of the United States Constitution and under Article I, Section 8 of the Connecticut Constitution; and an order enjoining Defendant from enforcing the law.

On August 20, 2015, Defendant, the Commissioner of the State of Connecticut Department of Energy and Environmental Protection, moved to dismiss under Rule 12(b)(6), arguing that VIZIO had failed to state a claim upon which relief can be granted.

For the reasons that follow, the Court GRANTS Defendant's Motion to Dismiss [Doc. No. 21].  Plaintiff's claim for violation of the Dormant Commerce Clause under an extraterritoriality theory is dismissed without prejudice.  All of Plaintiff's other claims are dismissed with prejudice.

## II.    FACTUAL BACKGROUND[1]

Incorporated in late 2002, VIZIO entered the television market in 2003.  When it entered the market, there were no laws in place requiring it to finance the recycling of other manufacturers' electronic devices or of types of electronic devices that it never produced or intended to produce or electronic devices that were the subject of transactions occurring prior to the law's implementation.

In July 2007, Connecticut enacted Public Act No. 07-189, which has been amended several times and is codified at Sections 22a-629 through 22a-640 of the Connecticut General Statutes, and the Connecticut Department of Energy and Environmental Protection ("DEEP") subsequently promulgated regulations, located at Sections 22a-630(d)-1 and 22a-638-1 of the Regulations of Connecticut State Agencies (collectively, the "E-waste Law").  DEEP is responsible for administering the E-waste Law, which applies to each manufacturer of covered electronic devices, or "CEDs."  Conn. Gen. Stat. § 22a-630(a).  VIZIO is considered a "manufacturer" for purposes of the statute.  *See* Conn. Gen. Stat. §§ 22a-629(7), (11).

Like many electronic products, televisions contain heavy metals and other hazardous materials that pose serious environmental and public health risks.  The E-waste Law creates a comprehensive regulatory scheme for the collection and recycling of CEDs, including televisions.  Recycling activities are carried out by covered electronic recyclers ("CERs"), who are private entities approved and regulated by DEEP.

Under the E-waste Law, each CED manufacturer must register with DEEP and participate in the program to implement and finance the collection, transportation, and recycling

---

[1] All background information is taken from the Complaint, unless otherwise noted.  All allegations in the Complaint are accepted as true for purposes of the motion to dismiss.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("it is well established that, in passing on a motion to dismiss, . . . the allegations of the complaint should be construed favorably to the pleader").

of CEDs.  Manufacturer registration fees fund DEEP's administration of the E-waste program.

The initial registration fee for each manufacturer is at least $5,000, and manufacturers must pay

subsequent annual registration fees that are based on a sliding scale that is representative of the

manufacturer's current share of sales in the national television market ("National Market

Share").

There are a number of models by which states can and do assess e-waste recycling costs

under "Extended Producer Responsibility" ("EPR") laws such as Connecticut's E-waste Law.

Twenty-four other states regulate e-waste.  Most states that have EPR laws use some form of

sales data as the basis for allocating recycling obligations, but there is not uniformity in the kinds

of sales data used.  For example, New York uses state market share rather than National Market

Share.  Other states, such as New Hampshire, have chosen not to regulate e-waste at all.

The various state e-waste programs also differ in various other ways.  Some state

programs require use of state-sanctioned recyclers that invoice manufacturers throughout the

year.  Other states require manufacturers actually to collect and recycle CEDs.  Some states set

recycling "goals" for each manufacturer, while other states, like Connecticut, have no limits on

the amount of waste that may be recycled and billed to manufacturers.  Some state programs

assign allocations according to sales, while others assign allocations based on television units

returned for recycling.  Some state laws account for the weight of the manufacturers' televisions

in deriving regulatory obligations, while others do not.  VIZIO expends large amounts of

resources to administer the different state programs, each of which imposes a separate obligation

and additional cost on VIZIO.

Connecticut has adopted two formulas for assessing costs under the E-waste Law.  For

CEDs other than televisions, the law uses a "Return Share" model that apportions costs on each

manufacturer based on the weight of its own products that are actually returned for recycling in a given period.  For televisions, the law uses a "market share" approach, under which each manufacturer's costs are based on a percentage of the total weight of all televisions that are recycled in a given period, regardless of brand, multiplied by a specified price per pound.  The percentage of the total weight of all televisions that each manufacturer is responsible for is based on its current National Market Share.

CERs directly bill manufacturers quarterly.  DEEP approves recyclers to become CERs through an application process.  In deciding whether to approve an applicant, DEEP considers such matters as a recycler's qualifications and experience, proposed procedures and process flow, the transporters and facilities proposed to be used, and the fees proposed to be charged. After approval, DEEP retains oversight over the CER and may revoke, suspend, or modify a CER's approval.  Connecticut's oversight over e-waste recyclers allegedly has created barriers to market entry and has led to recycling costs that are higher than the national average.

As an alternative compliance mechanism, the E-waste Law permits television manufacturers to participate in a private program or arrange for the return of CEDs for third party recycling.  These alternatives remain tied to the manufacturer's National Market Share.

The E-waste Law also imposes labeling requirements.  "A manufacturer or retailer shall not sell or offer for sale a covered electronic device in the state unless it is labeled with the manufacturer's brand, and the label is permanently affixed and readily visible."  Conn. Gen. Stat. § 22a-633.

DEEP compiles a list of manufacturers that are in compliance with the E-waste Law and requires retailers in Connecticut to consult the list prior to selling any CED; retailers are prohibited from offering a CED for sale in Connecticut unless the manufacturer of the CED

4

appears on that list.  Conn. Gen. Stat. § 22a-634.  DEEP has the power to impose cease and desist orders and to revoke registrations for any violations; courts may grant temporary and permanent injunctive relief for violations; and the state attorney general can bring a civil proceeding to enforce any violation.  Conn. Gen. Stat. § 22a-637.

VIZIO has been subject to and complied with the E-waste Law since its implementation. Its customers consist predominantly of large retailers and its sales to these retailers generally take place in states where the retailers have distribution operations, such as New York.  The retailers then distribute the televisions, at their discretion, to various locations throughout the country for resale to individual consumers.  VIZIO does not sell to any distribution centers in Connecticut and allegedly has relatively few direct sales in the state (97 in 2012, 47 in 2013, and 46 in 2014). DEEP has determined that VIZIO's billable market share was 14.33% in 2012 and 16.088% in 2013, and proposed a market share of 17.16% for 2014.  As a relatively new entrant into the television marketplace, VIZIO has never sold cathode ray tube ("CRT") televisions and has only distributed flat panel televisions.  CRT televisions often weigh more than ten times as much as VIZIO's flat panel televisions.

The E-waste Law does not account for the weight of a manufacturer's products in determining National Market Share, but only considers sales data.  Similarly, the law does not account for the type or amount of hazardous substances in manufacturers' televisions.  For example, CRTs contain significant quantities of lead, which is expensive to recycle, but VIZIO's flat screen televisions only contain miniscule concentrations of lead in compliance with multiple state and international regulations restricting the use of hazardous materials in consumer electronics.

There is no Return Share data for Connecticut, but in a recent study of over 23,000 pounds of televisions collected for recycling in Connecticut, not a single VIZIO product was found.  Return Share data does exist for Washington, where, based on two recent invoices, VIZIO's Return Share was calculated to be 0.09% and 0.16% of the total e-waste stream collected and invoiced.

The E-waste Law also provides that "No Connecticut resident giving seven or fewer covered electronic devices to a collector at any one time shall be charged any fees or costs for the collection, transportation or recycling of such covered electronic devices."  Conn. Gen. Stat. § 22a-635(b).  In addition, the law specifically exempts clothes washers, clothes dryers, refrigerators, freezers, microwave ovens, conventional ovens and ranges, dishwashers, air conditioners, dehumidifiers, air purifiers, telephones of any type, and handheld devices, which are types of products that often contain potentially hazardous or toxic substances.

## III.   STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (citations omitted).  When deciding a Rule 12(b)(6) motion to dismiss, a court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557 (2007). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

Plaintiff challenges the E-waste Law both facially and as applied. A party "making a facial challenge to a statute . . . must show that no set of circumstances exists under which the [challenged statute] would be valid." *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990) (internal quotation marks omitted). "Facial challenges are generally disfavored." *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). "In an as-applied challenge, the question is whether the statute was unconstitutional as applied to the facts of the case." *Tsirelman v. Daines*, 19 F. Supp. 3d 438, 447-48 (E.D.N.Y. 2014) *aff'd*, 794 F.3d 310 (2d Cir. 2015). "[A] plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 n.4 (2014).

"[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

## IV.   DISCUSSION

### A.   THE COMMERCE CLAUSE CLAIMS

The Commerce Clause provides that "[t]he Congress shall have power . . . [t]o regulate commerce . . . among the several states." U.S. Const. art I, § 8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273 (1988).

The dormant Commerce Clause prohibits laws that: (1) "clearly discriminate[] against interstate commerce in favor of intrastate commerce"; (2) violate the *Pike* balancing test by imposing "a burden on interstate commerce incommensurate with the local benefits secured"; or (3) "ha[ve] the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004) ("*Freedom Holdings I*"). In addition, for state laws that impose a "user fee," the fee must (1) be "based on some fair approximation of use of the facilities," (2) not be "excessive in relation to the benefits conferred," and (3) "not discriminate against interstate commerce." *Northwest Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 369 (1994).

Plaintiff asserts that the E-waste Law is unconstitutional under each of these tests, while Defendant argues that none of them is violated on the facts alleged.  The Court finds that the Complaint fails to state a plausible claim that, under the Commerce Clause, the E-waste Law is clearly discriminatory, imposes burdens on interstate commerce that outweigh the benefits secured, regulates commerce extraterritorially, or imposes user fees.

### 1.     The General Dormant Commerce Clause Claim

Plaintiff alleges that the E-waste Law has a discriminatory effect on out-of-state manufacturers with no physical presence in Connecticut, *see* Compl. ¶ 72, that the E-waste Law's burdens on interstate commerce outweigh its local benefits to Connecticut residents, *see* Compl. ¶ 71, and that the E-waste Law has an extraterritorial reach that has the practical effect of controlling and regulating transactions beyond the boundaries of Connecticut, *see* Compl. ¶ 70.

### a.     Discriminatory Burdens Analysis

The E-waste Law survives the first two prongs of the dormant Commerce Clause analysis—clear discrimination and *Pike* balancing—for the same reason: Plaintiff has failed to allege facts to support a reasonable inference that the law imposes a disparate burden on interstate commerce.

The central issue in dormant Commerce Clause cases is whether the benefits of the state law outweigh its burdens on interstate commerce.  The nature of the balancing test depends on whether the law discriminates against those outside of a state in favor of those within it or treats all alike regardless of residence.  "[A] statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se*."  *Freedom Holdings I*, 357 F.3d at 216.

Absent clear discrimination, however, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In particular, "regulations that touch upon safety . . . are those that the [Supreme] Court has been most reluctant to invalidate. Indeed, if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce. Those who would challenge such bona fide safety regulations must overcome a strong presumption of validity." *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670 (1981).

"The bottom line is . . . that, under either the 'clear discrimination' or the '*Pike*' forms of analysis, the minimum showing required is that the state statute have a disparate impact on interstate commerce." *Freedom Holdings I*, 357 F.3d at 218 (internal quotation marks and citation omitted). In this case, construing the Complaint in the light most favorable to Plaintiff, the allegations do not plausibly show that the E-waste Law has any disparate impact on interstate commerce.

"A state statute violates the 'clear discrimination' standard when it constitutes 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Freedom Holdings I*, 357 F.3d at 217 (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994)). "A clearly discriminatory law may operate in three ways: (1) by discriminating against interstate commerce on its face; (2) by harboring a discriminatory purpose; or (3) by discriminating in its effect." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 48 (2d Cir. 2007) (citations omitted). The E-waste Law is

geographically neutral on its face with respect to television manufacturers—it treats all manufacturers the same regardless of where the manufacturer is located.  Plaintiff does not allege or argue that there is a discriminatory purpose to the E-waste Law.[2]  Therefore, the argument turns on whether there is a discriminatory effect to the E-waste Law.

Plaintiff alleges, in relevant part, that: (1) an in-state manufacturer that only sells within Connecticut would have a National Market Share commensurate with its in-state sales, and would therefore never be subject to the "regulatory burdens of conflicting states' e-waste laws," *see* Compl. ¶¶ 7, 51-52; and (2) an in-state manufacturer might have infrastructure in Connecticut that it could use to implement a private collection program, whereas out-of-state manufacturers might not, *see* Compl. ¶ 53.  None of these allegations plausibly could be read to show that the E-waste Law has a disparate impact on television manufacturers based on their respective geographic locations.  *See Businesses for a Better New York v. Angello*, 341 F. App'x 701, 705 (2d Cir. 2009) (holding that because a challenged law applied equally to in-state and out-of-state companies working in the state, "there is no disparate impact and no economic protectionism").  Plaintiff cites no case law supporting its position that a law violates the Commerce Clause if an in-state manufacturer might be better positioned to take advantage of one of its provisions than an out-of-state competitor, especially where the text of the law itself expresses no in-state preference.

Plaintiff contends that, even if the E-waste Law does not clearly discriminate against out-of-state manufacturers, it clearly discriminates against out-of-state consumers because they are

---

[2] For the first time at oral argument, Plaintiff asserted that the fact that the E-waste Law's mandatory recycling program only applies to CEDs "generated by a household in the state," Conn. Gen. Stat. § 22a-631(c), supports its discrimination theory.  While it is true, as Plaintiff pointed out, that it is a violation of the dormant Commerce Clause for a state to prohibit the importation of waste from other states, *see City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), the E-waste Law merely provides that e-waste from Connecticut residents must be collected and recycled, and is silent on the recycling of e-waste generated in other states.  *See* Conn. Gen. Stat. § 22a-631.

being forced to pay higher prices for Plaintiff's televisions to help finance Connecticut's recycling program.  However, "a state regulation 'discriminates' against interstate commerce only if it imposes commercial barriers or discriminates against an article of commerce by reason of its origin or destination out of State."  *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009).  The E-waste Law operates identically whether the television to be recycled was sold or manufactured in-state or out-of-state, and the alleged price impacts caused by the regulation are incurred irrespective of geography.

As Plaintiff notes, the Supreme Court indeed has observed that "[o]ur dormant Commerce Clause cases often find discrimination when a State shifts costs of regulation to other States, because when the burden of state regulation falls on the interests outside of the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected."  *United Haulers*, 550 U.S. at 345.  The cost of running the recycling program, however, has not been entirely shifted outside of the State because the same alleged higher product prices will result for residents of Connecticut as for those outside the State.  Given such facts, courts have held "that the burden imposed by the [challenged statute] was sufficiently subjected to those political restraints normally exerted when interests within the state are affected."  *Pharm. Research & Mfrs. of Am. v. Cty. of Alameda*, 768 F.3d 1037, 1042-43 (9th Cir. 2014).

Moreover, the allegations in the Complaint do not support a plausible inference that Plaintiff could not place the entire cost of the E-waste Law on its Connecticut consumers.  "If companies' independent economic decisions were a sufficient basis for claims of discriminatory 'effects' or excessive 'burden,' interstate businesses would always be in a position to nullify state regulation simply by arguing that they will shift regulatory costs to another state."  *Alliance*

12

*of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 58 (D. Conn. 2013) ("*Alliance I*") (granting

motion to dismiss dormant Commerce Clause claim) *aff'd*, 610 F. App'x 10 (2d Cir. 2015). *See*

*also infra* Section IV.A.1.b.i.

Perhaps most importantly, Plaintiff has not alleged any facts to show that the E-waste

Law is protectionist.  The putative "burden" on interstate commerce is essentially that the costs

imposed by the E-waste Law will have an indirect impact on Plaintiff's prices, thereby affecting

its sales and profits both in-state and out-of-state.  "Speculative or merely potential pricing

impacts not dictated by the state's regulatory regime are not cognizable under the dormant

Commerce Clause."  *Id*.

Failing to allege facts that could plausibly show clear discrimination, Plaintiff must allege

facts plausibly showing that "the burdens on interstate commerce [] exceed the burdens on

intrastate commerce."  *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155

F.3d 59, 75 (2d Cir. 1998) (internal quotation marks omitted).  The Second Circuit has

"recognized three circumstances in which an evenhanded regulation imposes an incidental

burden on interstate commerce: (1) when the regulation has a disparate impact on any non-local

commercial entity; (2) when the statute regulates commercial activity that takes place wholly

beyond the state's borders; and (3) when the challenged statute imposes a regulatory requirement

inconsistent with those of other states."  *Town of Southold*, 477 F.3d at 50 (internal quotation

marks omitted).  However, as previously noted, any such incidental burden must be disparate as

between interstate and intrastate commerce and must outweigh the local benefits.  *See also*

*Alliance of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 13 (2d Cir. 2015) (holding plaintiff

could not "state an undue burden claim under *Pike*" because the challenged statute "do[es] not

13

impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce") (internal quotation marks omitted).

Plaintiff makes a number of conclusory allegations as to incidental burdens on interstate commerce.[3]   However, all of these allegations, accepted as true, would apply equally to intrastate commerce.  As described *supra*, Plaintiff's allegations, construed in the light most favorable to Plaintiff, constitute a claim that the E-waste Law, by itself and in conjunction with other states' laws, operates to increase Plaintiff's cost of doing business, and "the fact that an interstate company stands to lose money is not of constitutional significance under the dormant Commerce Clause."  *Alliance I*, 984 F. Supp. 2d at 58.

Significantly, Plaintiff has not alleged that the health and safety interests that the benefits of the E-waste Law advance are illusory.  As discussed *supra*, "a State's power to regulate commerce is never greater than in matters traditionally of local concern," and there is a particularly "strong presumption of validity" where a statute's "safety justifications are not illusory."  *Kassel*, 450 U.S. at 670.  And, while the Supreme Court has held that "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack" and that "a weighing of the asserted safety purpose against the degree of interference with interstate commerce" is still required, *id.*, it has much more recently held that "economic legislation passed under the auspices of the police power," and intended to address "a typical and traditional concern of local government," should not be "rigorously scrutinize[d]" by

---

[3] *See*, *e.g.*, Doc. No. 24 at 18 ("(i) disruption of interstate flow of commerce (Compl. ¶ 49); (ii) shifting the costs of the E-Waste Program from in-state manufacturers and consumers to out-of-state manufacturers and consumers (Compl. ¶¶ 47, 49, 52); [and] (iii) disparate treatment of out-of-state manufacturers as a result of, *inter alia*, disproportionately higher regulatory burdens for out-of-state sales, the lack of infrastructure to implement a recycling program, and disqualification from a *de minimis* disposal exemption (Compl. ¶¶ 52-54); (iv) creating a patchwork of overlapping state regulatory requirements in an area where national uniformity it necessary (Compl. ¶ 48); and (v) creating regulatory gridlock (Compl. ¶ 48).") (citations omitted).

the courts "under the banner of the dormant Commerce Clause." *United Haulers*, 550 U.S. at 347.

Plaintiff's allegations cannot overcome the strong presumption of validity in the face of the non-illusory health and safety interests at issue in this case. "[T]he degree of interference with interstate commerce," *Kassel*, 450 U.S. at 671, based on the allegations as discussed *supra*, is essentially non-existent. At the same time, while Plaintiff alleges, for example, that the National Market Share provision of the E-waste Law does not advance the implicated health and safety interests more effectively as compared to other methods of cost allocation would, *see* Compl. ¶ 57, and that the E-waste Law would be more effective at advancing those interests if it covered additional types of products, *see* Compl. ¶ 58, such allegations do not plausibly establish that the E-waste Law furthers its salutary purpose so marginally "as to be invalid under the Commerce Clause," *Kassel*, 450 U.S. at 670.

In sum, there are no allegations in the Complaint from which the Court could reasonably infer that the E-waste Law facially discriminates, was enacted for a discriminatory purpose, has discriminatory effects, or even disparately burdens interstate commerce. Plaintiff therefore has failed to plausibly state a dormant Commerce Clause claim under the first two prongs of the analysis.

### b.      Extraterritoriality

The third prong of the dormant Commerce Clause analysis—extraterritoriality—is "the most dormant doctrine in dormant commerce clause jurisprudence." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1170 (10th Cir.) ("*EELI*") *cert. denied*, 136 S. Ct. 595 (2015); *see also IMS Health Inc. v. Mills*, 616 F.3d 7, 29 & n.27 (1st Cir. 2010) (extraterritoriality is "an infrequently applied strand of the dormant Commerce Clause" and "has been the dormant branch

of the dormant Commerce Clause") (internal quotation marks and citations omitted) *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011).  Indeed, "a [Supreme Court] majority has used [the] extraterritoriality principle to strike down state laws only three times."  *EELI*, 739 F.3d at 1173.

The Supreme Court has crystallized the extraterritoriality analysis as follows:

> First, the Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State, and, specifically, a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states.  Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature.  The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.  Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.   Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.  And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.

*Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989).

### i.        Out-of-State Pricing

Plaintiff's first extraterritoriality argument goes to the *Healy* prohibition against state statutes that directly control "prices for use in other states."  *Healy*, 491 U.S. at 336.  Plaintiff argues that "the practical effect," *id.*, of the E-waste Law is to control the price of its televisions sold in other states.  As *Healy* instructs, in evaluating the practical effect of a statute, the Court must not only consider the consequences of the statute itself, but also consider "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."  *Id.*

16

"Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id.* at 336-37.

In support of its position, Plaintiff points to its allegation that, "by tying manufacturers' regulatory responsibility to National Market Share, the practical effect of the E-Waste Law is to directly regulate VIZIO's out-of-state sales and to control VIZIO's conduct outside of the state's boundaries." Compl. ¶ 40. Specifically, "one practical effect of the E-Waste Law is to control prices outside of Connecticut, which in turn affects interstate pricing decisions." *Id.* Plaintiff also alleges, "The E-Waste Law, individually and collectively with other states' e-waste laws, is establishing a piecemeal pricing mechanism for interstate goods. The impact is to short circuit normal pricing decisions by effectively regulating a pricing mechanism for goods in interstate commerce." Compl. ¶ 41.

These allegations amount to no more than proposed inferences, and Plaintiff has not alleged any facts to support them. Such conclusory allegations do not provide the "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Plaintiff argues that these allegations are sufficient nonetheless because of the Second Circuit's decision in *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ("*Grand River I*"), in which several tobacco companies challenged a multi-state regulatory scheme governed by a master settlement agreement ("MSA") between a number of states and tobacco companies and various states' statutes known as Escrow Statutes and Contraband Laws. The scheme imposed obligations on tobacco companies for health costs incurred by the states.

17

Tobacco companies that were not parties to the MSA were required to either join the MSA or pay into escrow accounts.

In *Grand River I*, the Second Circuit permitted a dormant Commerce Clause claim to survive a motion to dismiss because "the Supreme Court recognized a potential problem where multiple states decide to enact 'essentially identical' statutes in the pricing-parity context," and "worried about potential regulatory 'price gridlock' or the 'short-circuiting of normal pricing decisions' that could result." *Id.* at 171 (citing *Healy*, 491 U.S. at 339).

> Accordingly, appellants have successfully stated a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the [] settlement and [] escrow payments to national market share, which in turn affects interstate pricing decisions. We cannot say at this early stage of the litigation on a motion to dismiss that the Statutes' practical effect is solely intrastate, for the appellants have essentially alleged that the aggregate effect of the thirty-one states' Escrow Statutes and the MSA is to short-circuit normal pricing decisions by effectively regulating the pricing mechanism for goods in interstate commerce. While we take no position as to the ultimate viability of the dormant commerce clause claim, we believe that not dismissing this claim at the pleading stage is consistent with the district court's decision to reinstate the Sherman Act claim, which alleged that the MSA and interrelated statutes restrained trade and affected market prices.

*Id.* at 173 (internal quotation marks and citation omitted).

The *Grand River I* decision is distinguishable in a number of critical ways. First, the challenged policy there was motivated, in part, by concern that tobacco companies that did not have to make payments as required by the MSA would be able to charge lower prices than companies that were part of the MSA. *See id.* at 163. Thus, the regulatory scheme at issue existed "in the pricing-parity context," *id.* at 171, much like the protectionist statutes at issue in three of the four Supreme Court cases finding extraterritoriality, *see Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Healy*, 491 U.S. 324; *Brown-Forman Distillers Corp. v. New York*

18

*State Liquor Auth.*, 476 U.S. 573 (1986).  The E-waste Law does not require manufacturers to standardize the price of televisions across state lines.

Second, the Court in *Grand River I* was concerned about the impact of "essentially identical statutes."  *Grand River I*, 425 F.3d. at 171 (internal quotation marks omitted).  In contrast, Plaintiff here alleges facts showing that various states' e-waste statutes differ in significant ways.  *See*, *e.g.*, Compl. ¶ 48.

Third, far from the conclusory allegations in this case, the plaintiffs in *Grand River I* alleged enough facts for a court reasonably to infer that the law acted to directly regulate the price of cigarettes.  *See* Am. and Suppl. Compl., ECF No. 195, *Grand River, et al. v. Pryor, et al.*, No. 1:02-cv-5068 (S.D.N.Y. Mar. 28, 2008) ("*Grand River* Compl.").  The allegations in *Grand River I* describe a virtually-uniform regulatory scheme among forty-six states that was designed to neutralize price competition and forced smaller tobacco companies that were not parties to the MSA to raise their prices by $5.00 for every carton sold in every MSA State; unlike the allegations in this case, the *Grand River I* allegations provided a sufficient factual basis upon which a court could reasonably infer that these various states' statutes effectively and purposefully controlled the interstate pricing of the plaintiffs' product.  *Compare Grand River Compl.* ¶¶ 8, 10-12, 14, 15, 70, 73-74, 83-96, 99, 112-14, 119-20, 126, 129-31, *with* Compl. ¶¶ 5, 38, 40-41, 46, 48, 52.

As a result, *Grand River I* does not stand for the proposition that the mere use of the phrase "national market share" allows a dormant Commerce Clause claim to survive a motion to dismiss.[4]  Indeed, on remand, the district court explicitly noted that, even if the challenged

---

[4] It is significant that, as quoted *supra*, the Second Circuit observed that allowing the extraterritoriality claim to proceed was consistent with the district court's decision to allow the Sherman Act claim, "which alleged that the MSA and interrelated statutes . . . affected market prices," to proceed.  The two claims were, as thus noted, predicated largely on the same theory of interstate restraints on price competition, and if the factual allegations were

statutes' "indirect reference to national market share could implicate the dormant Commerce Clause," it would not necessarily mean "that their practical effect is to control prices." *Grand River Enterprises Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 542 (S.D.N.Y. 2011). Factual allegations that could plausibly show that the E-waste Law's use of National Market Share data somehow directly controls prices in transactions occurring wholly outside the State are still required, but Plaintiff has not provided the Court with any such facts.

At best, Plaintiff's factual allegations support an inference that the costs imposed by the E-waste Law have reduced Plaintiff's profit margins and created economic pressure to raise its prices nationwide to offset those losses.[5] Courts, however, have uniformly rejected extraterritoriality claims based on a "mere upstream pricing impact . . . even if the impact is felt out-of-state where the stream originates." *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 67 (2d Cir. 2010) ("*Freedom Holdings II*") (internal quotation marks omitted); *see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 111 (2d Cir. 2001) ("*NEMA*") (finding no extraterritoriality violation even though "it is axiomatic that the increased cost of complying with a regulation may drive up the sales price of the product"); *EELI*, 793 F.3d at 1173-74 ("We readily recognize that state regulations nominally concerning things other than price will often have ripple effects, including price effects, both in-state and elsewhere. . . .  Still, without a regulation more blatantly regulating price and discriminating against out-of-state consumers or producers, *Baldwin*'s near

---

sufficient to state a plausible claim for one, it would stand to reason that they should be sufficient to state a plausible claim for the other, as well.

[5] Plaintiff has not alleged any actual change in its prices caused by the E-waste Law. The price-related allegations in the Complaint are all theoretical or conclusory in nature. *See*, *e.g.*, Compl. ¶ 1 (The E-waste Law "threatens VIZIO's ability to innovate and competitively price its products for consumers."); Compl. ¶ 5 ("[T]he E-Waste Law . . . affect[s] interstate pricing decisions and lead[s] to . . . consumer price impacts."); Compl. ¶ 40 ("[O]ne practical effect of the E-Waste Law is to control prices outside of Connecticut, which in turn affects interstate pricing decisions."). This is an additional flaw with Plaintiff's extraterritoriality claim. *See*, *e.g.*, *Silver v. Woolf*, 694 F.2d 8, 14 (2d Cir. 1982) ("[Plaintiff] asks us to render the legislation invalid because of 'the prospect' of an impermissible aggregate burden on commerce. Courts are not in the business of deciding legality of such 'prospects.'").

*per se* rule doesn't apply").  The type of direct price "control" required to state an extraterritoriality claim is not supported "simply by coincident obligations which may produce parallel price increases among the states."  *Freedom Holdings II*, 624 F.3d at 67.

Fourth, the E-waste Law does nothing to prevent Plaintiff from passing along any added costs imposed by the E-waste Law directly to its Connecticut consumers instead of spreading any resulting price increase nationwide.  *See*, *e.g.*, *id.* at 66 (holding that "nothing prevents manufacturers from recouping increased costs imposed by New York law from New York consumers," and thus "plaintiffs cannot show that the challenged statutes violate the Commerce Clause"); *NEMA*, 272 F.3d at 110 (no dormant Commerce Clause violation where "manufacturers remain free to charge higher prices only to Vermonters without risking violation of the statute").  *See also supra* Section IV.A.1.a.

### ii.    Out-of-State Transactions

In addition to prohibiting direct regulation of out-of-state prices, the prong on extraterritoriality prohibits states from controlling transactions that occur in other states.  In *Edgar v. MITE Corporation*, 457 U.S. 624 (1982), the Supreme Court held that an Illinois law requiring its secretary of state to adjudicate the fairness of tender offers for the purchase of corporate stock and reject the transaction under certain conditions was a "direct restraint on interstate commerce" because the state was controlling "conduct beyond the boundary of the state."  457 U.S. at 642.

Plaintiff alleges that the various states' e-waste laws impose "overlapping, inconsistent, and confusing obligations" on television manufacturers.  Compl. ¶ 48.  Plaintiff argues that it "has alleged many other facts supporting its extraterritoriality claim," setting forth "a number of ways in which the E-Waste Law effectively controls out-of-state transactions, two of which

highlight the extraterritorial effects of the law," specifically: (1) that "due to the statutory definition of 'manufacturer,' a company may become subject to the full burdens of the E-Waste Program even if it has never conducted any business within the state"; and (2) that "once the manufacturer is ensnarled by the regulation, DEEP determines the manufacturer's recycling burden based on national sales, thereby effectively regulating sales that did not occur within the State."  Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss [Doc. No. 24] at 24 (citing Compl. ¶¶ 40-50, 70).[6]

Plaintiff's first argument is essentially that, because its retail customers control where its televisions are sold to the end consumer, and because Plaintiff is subject to the E-waste Law, as long as one of its retail customers sells one of its products in Connecticut, Plaintiff is forced to register and comply with the E-waste Law in order to effectuate all of its out-of-state sales. However, that argument is nothing more than a variation of the labeling claim that Plaintiff has abandoned because it is foreclosed by *NEMA*, which applies equally to this claim.

In *NEMA*, the Second Circuit upheld a Vermont statute imposing labeling requirements on mercury-containing light bulbs against a dormant Commerce Clause challenge.  272 F.3d at 107-12.  Like the labeling requirement in *NEMA*, and unlike the statute challenged in *Edgar*, 457 U.S. 624, the E-waste Law is silent about whether and how Plaintiff may sell its products outside of Connecticut, and it does not require Plaintiff to obtain regulatory approval from DEEP before selling out-of-state.

Rather, the law merely requires that, if Plaintiff's products are offered for sale in Connecticut, then Plaintiff must comply with Connecticut's regulatory scheme.  If Plaintiff

---

[6] The Complaint also alleges that the E-waste Law's labeling requirements operate extraterritorially.  *See* Compl. ¶¶ 30, 50.  Defendant points out that the Second Circuit squarely rejected that exact claim in *NEMA*, 272 F.3d at 110-11.  *See* Def. MTD Br., at 24.  Plaintiff has not countered Defendant's point, and thus appears to have conceded it.

wishes to continue selling in other states without being subject to that regulatory scheme, it is free to withdraw from the Connecticut market by stopping its direct sales into the state and by contractually requiring that its retail customers do the same, or by otherwise changing its distribution processes to ensure that its products are not offered for sale in this state. Furthermore, even if Plaintiff were to have alleged facts to show that it would be impossible for it to change its sales practices or distribution processes, any manufacturer simply can choose not to register with DEEP, and retailers automatically would be prohibited from selling its products in Connecticut. *See* Conn. Gen. Stat. §§ 22a-630, 22a-634. In any event, these choices are Plaintiff's to make. *See NEMA*, 272 F.3d at 110-12; *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (holding that while some business "may choose to withdraw entirely from" a state's market, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.").

While Plaintiff argues that it should be allowed to proceed to discovery on this theory, Plaintiff has failed to allege any facts that could plausibly establish the impossibility of its products not being offered for sale within Connecticut. In fact, quite to the contrary, Plaintiff explicitly alleges that it "could escape the law's reach" by "requir[ing] its retail customers to suspend sales in Connecticut." Compl. ¶¶ 49.

Plaintiff's second argument is essentially that, separate and apart from its price control theory, the E-waste Law, as applied to manufacturers whose Connecticut market shares are lower than their National Market Shares, effectively regulates[7] their out-of-state sales because the law's use of National Market Share data creates liability based on out-of-state conduct. Plaintiff

---

[7] *Black's Law Dictionary* defines the term "regulate" as meaning, "To control (an activity or process) esp. through the implementation of rules."

argues that the National Market Share provision of the E-waste Law directly captures out-of-state sales, which it equates to directly regulating those sales.

In support of its argument, Plaintiff analogizes this case to *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003), and *North Dakota v. Heydinger*, 15 F. Supp. 3d 891 (D. Minn. 2014) *on appeal*, Nos. 14-2156, 14-2251 (8th Cir. 2014).  In *American Booksellers*, a Vermont law prohibiting the dissemination of sexually explicit material to minors through Internet communications was deemed extraterritorial.

> Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States.
>    A person outside Vermont who posts information on a website or on an electronic discussion group cannot prevent people in Vermont from accessing the material.  If someone in Connecticut posts material for the intended benefit of other people in Connecticut, that person must assume that someone from Vermont may also view the material.  This means that those outside Vermont must comply with [the challenged statute] or risk prosecution by Vermont.  Vermont has projected [the challenged statute] onto the rest of the nation.

*Am. Booksellers*, 342 F.3d at 103.

However, *American Booksellers* is inapposite on the issue of extraterritoriality.  First, *American Booksellers* involved a direct regulation.  Similarly to how the Illinois statute in *Edgar* empowered the State to prohibit certain out-of-state stock purchases, the Vermont statute prohibited the posting of sexually explicit material on the Internet.  Second, out-of-staters could not avoid prosecution in Vermont for engaging in the proscribed conduct because of the "boundary-less nature" of the Internet.  *Id*.  Third, *American Booksellers* involved the regulation of an intangible product, as was the case in *Heydinger*.

*Heydinger* involved a Minnesota law limiting increases in statewide power sector carbon dioxide emissions.  Analogizing that case to *American Booksellers*, the *Heydinger* Court held that the statute violated the extraterritoriality doctrine because, like the Internet, the electricity

grid has a "boundary-less nature," with electricity that enters the grid being "indistinguishable

from the rest of the electricity in the grid."[8]  15 F. Supp. 3d at 917-18.  The *Heydinger* Court,

however, explicitly distinguished that case and *American Booksellers* from cases involving

"tangible products."  Citing several cases, including *NEMA*, the Court noted that "regulation of

tangible products (sweeping compounds, light bulbs, and ethanol, respectively) that could be

shipped directly from point A to point B" does

> not require out-of-state parties to transact out-of-state business according to the
> regulating state's terms because the manufacturers could simply avoid engaging
> in the prohibited conduct when transacting out-of-state business.  As noted by the
> court in [*NEMA*], light bulb manufacturers could continue selling mercury-
> containing light bulbs outside of Vermont simply by modifying their production
> and distribution systems.  Unlike those tangible products, however, electricity
> cannot be shipped directly from Point A to Point B.

*Id.* at 918.  Televisions are undeniably tangible products that can be shipped directly from Point

A to Point B, a fact that Plaintiff acknowledges.  *See* Doc. No. 24 at 14 n.10.

To overcome the tangible product issue, Plaintiff argues that it has pled that "the

interstate television market is similar to the electricity market in that the dynamics of the

marketplace preclude manufacturers from exerting any control over where their products end up

for sale."[9]  *Id.* (citing Compl. ¶ 42).  However, Paragraph 42 of the Complaint merely alleges, in

relevant part, "Once VIZIO sells a television to its retail customers out-of-state, VIZIO has no

---

[8] "Modern regional electrical power grids and markets (such as MISO) share striking similarities to the Internet.
Users in states geographically far from Minnesota are 'connected' to Minnesota in much the same way that Internet
users in far-flung states and countries are connected to Vermont.  Power generated in one state may be consumed by
users in another state.  The nature of the network means that power producers do not know and cannot control who
consumes the energy that they generate, and consumers are likewise unable to know the source of the power that
they consume.  As Defendants themselves note, such knowledge would be impossible to prove because, in the
MISO energy markets, a buyer is simply purchasing electricity from a pool of electrons in the transmission system
and, as a result, does not know the source of electrons purchased."  *Heydinger*, 15 F. Supp. 3d at 917 (internal
quotation marks omitted).
[9] *Iqbal* and *Twombly* would seem to demand more of a factual basis for a court to reasonably infer that selling
television sets is more akin to selling electricity or posting materials on a website than it is to selling light bulbs.

control over whether the televisions are then sold by the retail customer in Connecticut and/or ultimately disposed of in Connecticut."

This is too attenuated an allegation from which to infer that the "dynamics of the marketplace" make it impossible for manufacturers to "modify[] their production and distribution systems" to avoid having any of their television sets sold by their customers to retail consumers in Connecticut, and there are no allegations in the Complaint that could form the basis for a plausible inference that such is the case. As already noted *supra*, the Complaint actually supports the opposite inference by alleging, "The only way that VIZIO could escape the E-waste Law's reach would be to require its retail customers to suspend sales in Connecticut." Compl. ¶ 49. This allegation undercuts Plaintiff's argument that "[a] manufacturer cannot remove itself [from] the reach of the law by conducting its business out of state." Pl's Sur-Reply Br. in Further Opp'n to Mot. to Dismiss [Doc. No. 30] at 5 n.5.

Based on the allegations in the Complaint, construed in the light most favorable to Plaintiff, this case is like *NEMA* on this issue, in that Plaintiff can avoid the requirements of the E-waste Law by making sure its products are not sold in Connecticut. *See NEMA*, 272 F.3d at 110-12. At the same time, the E-waste Law does not dictate or restrict the manner or terms upon which Plaintiff's out-of-state sales take place. Therefore, the E-waste Law does not "regulate" those out-of-state sales. While it is true that Plaintiff's in-state and out-of-state sales influence the amount that Plaintiff must pay under the E-waste Law for recycling e-waste collected in Connecticut, the fact that Plaintiff's out-of-state sales have local impacts in Connecticut does not in any way equate to extraterritorial "regulation" of those out-of-state sales, which Plaintiff is free to make whenever and however it wants.

Plaintiff has not alleged any facts that plausibly show that the E-waste Law controls prices of Plaintiff's products in other states or directly regulates Plaintiff's out-of-state transactions in any other way.  Therefore, the Court finds, as a matter of law, that the E-waste Law does not have an extraterritorial reach under the dormant Commerce Clause.

### c.     Conclusion

Because the E-waste Law does not clearly discriminate against interstate commerce, does not impose disproportionate burdens on interstate commerce that exceed the local benefits of the law, and does not have the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of Connecticut, Defendant's motion to dismiss is granted with respect to Count 1 of the Complaint.

The Court grants Plaintiff leave to amend its complaint to add factual allegations from which the Court could reasonably infer that the National Market Share provision of the E-waste Law has the practical effect of directly controlling the interstate prices of its televisions, consistent with the pleading requirements described in this Ruling.  The Court, however, reiterates that additional factual allegations showing that the E-waste law merely affects the prices charged by Plaintiff will not suffice to state a claim for violation of the dormant Commerce Clause under an extraterritoriality theory.  *See, e.g.*, *Freedom Holdings II*, 624 F.3d at 67-68.

### 2.     User Fee Claim under the Commerce Clause

Count 2 of the Complaint alleges that the E-waste Law "charges user fees that are not a fair approximation of each manufacturer's use of Connecticut's E-Waste Program and are excessive in relation to the benefit conferred upon certain manufacturers, including VIZIO individually, thereby imposing impermissible burdens on interstate commerce" and violating the

dormant Commerce Clause.  Compl. ¶¶ 78, 80.  However, the facts alleged in the Complaint, viewed in the light most favorable to Plaintiff, do not support this conclusory statement.

Black's Law Dictionary defines "user fee" as "[a] charge assessed for the use of a particular item or facility."  Recognizing that "[w]here a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor," the Supreme Court has long "regard[ed] it as settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike," and that such a charge is "not a burden in the constitutional sense." *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 712-14 (1972) (internal quotation marks and citations omitted).  A user fee "is reasonable under *Evansville* if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce."  *Northwest Airlines*, 510 U.S. at 369 (1994) (citing *Evansville*, 405 U.S. at 716-17).

The charges for the recycling costs in this case do not even constitute "user fees," subject to the Commerce Clause.  The Supreme Court has held that its user fee cases "apply only to 'charge[s] imposed by the State for the use of state-owned or state-provided transportation or other facilities and services.'"  *Oregon Waste*, 511 U.S. at 103 n.6 (1994) (quoting *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621 (1981)).  Connecticut is not imposing charges for any state-owned or state-provided facilities or services furnished "at its own expense . . . for the use of those engaged in commerce."  *Evansville*, 405 U.S. at 712.  The E-waste Law explicitly states that all recycling activities are carried out by CERs, all of whom are private entities who use their own facilities and services.  *See* Conn. Gen. Stat. § 22a-631(c).  In

addition, manufacturers do not pay recycling costs to the State under the statute; rather, they pay these costs to private entities.  *See* Conn. Gen. Stat § 22a-631(d).  Thus, the E-waste Law's charges for recycling costs are not user fees.  *See Oregon Waste*, 511 U.S. at 103 n.6 ("Because it is undisputed that . . . the landfills in question are owned by private entities, including Oregon Waste, the out-of-state surcharge is plainly not a user fee.").

As for the registration and administrative fees imposed by the E-waste Law, there are no factual allegations in the Complaint to show plausibly that such fees do not pass the *Evansville* test.  There is no discrimination against interstate commerce because the registration and administrative fees imposed by the E-waste Law apply equally to all manufacturers, without respect to their geographic locations.  The fees are not excessive in relation to the benefits conferred because the statute provides that "[a]ll fees charged shall be based on factors relative to the costs of administering such program," and expressly limits the fees to amounts necessary "to fully cover but not to exceed expenses incurred by the commissioner for the implementation of such program."  Conn. Gen. Stat. § 22a-630(d).

Plaintiff argues that it is premature to analyze whether these fees are based on some fair approximation of each manufacturer's share of the State's costs for administering the program, but the Court cannot draw any reasonable inferences from Plaintiff's allegations that would demonstrate that these fees fail this prong of the *Evansville* test.  Like the recycling costs, these fees are based on National Market Share data, but unlike the recycling costs, these fees do not take into account the weight of the products being recycled.  Because nothing lasts forever, every television sold will eventually need to be recycled under the E-waste Law, *see, e.g.*, Conn. Gen. Stat. § 22a-636, and therefore, a sliding scale administrative fee based on a manufacturer's National Market Share data must roughly approximate its use of Connecticut's e-waste recycling

29

program over time, which is enough to satisfy the constitutional standard.  *See Selevan v. New York Thruway Auth.*, 711 F.3d 253, 259 (2d Cir. 2013) ("*Selevan II*") (holding that an "imperfect estimate of a [party's] fair share is constitutionally permissible," as is "some degree of inequity," and that "it is the amount of the [fee], not its formula, that is of central concern").[10]  A law that "is based on some fair approximation . . . will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users."  *Evansville*, 405 U.S. at 717.

The Court finds, as a matter of law, that the recycling charges imposed by the E-waste Law do not constitute user fees and that the law's registration and administrative fees are based on some fair approximation of each manufacturer's share of the State's costs for administering the program, are not excessive in relation to the benefits conferred, and do not discriminate against interstate commerce.  Accordingly, Defendant's motion to dismiss with respect to Count 2 is granted.

### B.    TAKINGS CLAIMS

Both the United States and Connecticut constitutions protect private property rights.  The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.[11]  Similarly, the Connecticut Constitution provides that "[t]he property of no person shall be taken for public use, without just compensation therefor."  Conn. Const. art. I, § 11.  Count 3 of the Complaint alleges that Defendant's enforcement of the E-waste Law has deprived Plaintiff of its rights under these two constitutional provisions.[12]

---

[10] Plaintiff has not alleged the amount of the registration and administrative fees it has paid under the E-waste Law.

[11] "The takings clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment."  *A. Gallo & Co. v. Comm'r of Envtl. Prot.*, 309 Conn. 810, 822 n.6 (2013).

[12] The parties do not dispute that Plaintiff's takings claims should be analyzed in the same manner under the federal and State constitutions.  *Cf. Bauer v. Waste Mgmt. of Connecticut, Inc.*, 234 Conn. 221, 250 n.16 (1995).

There are two general categories of takings: physical takings and regulatory takings.  *See*

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002).  In

this case, Plaintiff alleges that the approximately $1.8 million it spent complying with the E-

waste Law constitutes a regulatory taking.  "The gravamen of a regulatory taking claim is that

the state regulation goes too far and in essence 'effects a taking.'"  *Buffalo Teachers Fed'n v.*

*Tobe*, 464 F.3d 362, 374 (2d Cir. 2006).

"To state a claim under . . . the Takings Clause, plaintiffs were required to allege facts

showing that state action deprived them of a protected property interest."  *Story v. Green*, 978

F.2d 60, 62 (2d Cir. 1992) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000-04 (1984)).

The Takings Clause does not proscribe the "vast governmental power" to take private property

for public use, provided that the government pays just compensation when it does.  *Stop the*

*Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 734 (2010) (Kennedy,

J. concurring).  Therefore, takings claims typically involve property interests for which the

government can provide monetary compensation without the government being deprived of the

property or public benefit that it seeks.  *See id.* at 740-41 ("It makes perfect sense that the

remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the

taking of property; it proscribes taking without just compensation.") (internal quotation marks

omitted).

Regulatory takings claims must allege "specific and identified properties or property

rights . . . to come within the regulatory takings prohibition," such that the challenged regulations

are "so excessive as to destroy, or take, a specific property interest."  *Eastern Enterprises v.*

*Apfel*, 524 U.S. 498, 541, 542 (1998) (Kennedy, J. concurring in the judgment and dissenting in

part) (collecting cases identifying various specific property interests).  *See also id.* at 554

(Breyer, J. dissenting) ("The 'private property' upon which the [Takings] Clause traditionally has focused is a specific interest in physical or intellectual property.").

Ordinary regulatory obligations to pay money are different.  "Unlike real or personal property, money is fungible."  *United States v. Sperry Corp.*, 493 U.S. 52, 62 n. 9 (1989). Furthermore,

> [i]n the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others.  For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist.  Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.

*Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223 (1986).

A majority of five justices of the Supreme Court agreed in *Eastern Enterprises* that a law that simply imposes an obligation to perform an act, such as making a payment, does not take property in a constitutional sense.  *See E. Enterprises*, 524 U.S. at 539-47 (Kennedy, J.); *id.* at 554-58 (Breyer, J.).  "As [its] language suggests, at the heart of the [Takings] Clause lies a concern, not with preventing arbitrary or unfair government action, but with providing compensation for legitimate government action that takes 'private property' to serve the 'public good.'  *Id.* at 554 (Breyer, J.).  The Takings Clause is not "a substantive or absolute limit on the government's power to act.  The Clause operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge.  The Clause presupposes what the government intends to do is otherwise constitutional."  *Id.* at 545 (Kennedy, J.).

The Supreme Court has never held that the Takings Clause applies to the creation of "an ordinary liability to pay money."  *Id.* at 554 (Breyer, J.).  While the Supreme Court has "made clear that the Clause can apply to monetary interest generated from a fund into which a private individual has paid money," the "monetary interest at issue there arose out of the operation of a

specific, separately identifiable fund of money." *Id.* at 555.  It "is not surprising" that there is a "dearth of Takings Clause authority" where "there is no specific fund of money," but "only a general liability," because

> application of the Takings Clause here bristles with conceptual difficulties.  If the Clause applies when the government simply orders A to pay B, why does it not apply when the government simply orders A to pay the government, *i.e.*, when it assesses a tax?  Would that Clause apply to some or to all statutes and rules that routinely create burdens for some that directly benefit others?  Regardless, could a court apply the same kind of Takings Clause analysis when violation means the law's invalidation, rather than simply the payment of compensation?

*Id.* at 555-56 (Breyer, J.).  If the government must pay money as just compensation when it "takes" money through an otherwise permissible regulatory cost, then it would effectively have no power to impose those regulatory costs at all.

Although the Second Circuit has yet to confront the issue, other circuit courts consistently have followed "the conclusion reached by the majority of the Justices in *Eastern*—that an obligation to pay [undifferentiated, fungible] money cannot constitute a taking." *W. Virginia CWP Fund v. Stacy*, 671 F.3d 378, 386-87 (4th Cir. 2011), *as amended* (Dec. 21, 2011) (collecting cases).  Furthermore, Plaintiff has not identified any case law in which a court has held to the contrary.  In the absence of contrary Second Circuit authority, this Court agrees with the consensus view on the import of *Eastern Enterprises*.

Because the E-waste Law merely requires payment of fungible, undifferentiated monies, there is no cognizable Fifth Amendment property interest, and neither the Takings Clause nor the analogous provision of the Connecticut Constitution are implicated.  Accordingly, Plaintiff has failed to allege facts showing that the E-waste Law effects a taking, and the Court grants Defendant's motion to dismiss with respect to Count Three of the Complaint.

### C.        EQUAL PROTECTION CLAIMS

The United States Constitution provides, "No state shall . . . deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Connecticut

Constitution provides, "No person shall be denied the equal protection of the law nor be

subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or

political rights because of religion, race, color, ancestry, national origin, sex or physical or

mental disability."  Conn. Const. art. I, § 20.  Count 4 of the Complaint alleges that Defendant's

enforcement of the E-Waste Law has deprived Plaintiff of its rights to equal protection of the

laws as guaranteed by these two constitutional provisions.

As the Connecticut Supreme Court has explained,

[t]he concept of equal protection under both the state and federal constitutions has
been traditionally viewed as requiring the uniform treatment of persons standing
in the same relation to the governmental action questioned or challenged.
Conversely, the equal protection clause places no restrictions on the state's
authority to treat dissimilar persons in a dissimilar manner.  Thus, to implicate the
equal protection clause it is necessary that the state statute in question, either on
its face or in practice, treat persons standing in the same relation to it differently.

*Kerrigan v. Comm'r of Pub. Health*, 289 Conn. 135, 157-58 (2008) (internal quotation marks

and citations omitted); *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439

(1985) ("The Equal Protection Clause . . . is essentially a direction that all persons similarly

situated should be treated alike.").  "[T]his initial inquiry is not whether persons are similarly

situated for all purposes, but whether they are similarly situated for purposes of the law

challenged."  *Kerrigan*, 289 Conn. at 158.

Furthermore, "in accordance with the federal constitutional framework of analysis, . . . in

areas of social and economic policy that neither proceed along suspect lines nor infringe

fundamental constitutional rights," the equal protection clause of the Connecticut Constitution

is satisfied as long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Kerrigan*, 289 Conn. at 158-59 (internal quotation marks and citations omitted) (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174, 179 (1980); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981); *City of Cleburne*, 473 U.S. at 446).

Plaintiff has alleged that the E-waste Law:

- "treats relatively new and successful electronics companies, including VIZIO individually, that currently have a large and growing National Market Share, differently than those older electronics companies that have a shrinking National Market Share," Compl. ¶ 97;

- "treats electronics companies that never manufactured or sold CRTs, including VIZIO individually, differently than those electronics companies that have manufactured or sold CRTs," Compl. ¶ 98; and

- "treats electronics companies that primarily manufacture or sell televisions, including VIZIO individually, differently than electronics companies that produce non-television CEDs or electronic devices that are not regulated by the E Waste Law," Compl. ¶ 99.

In sum, Plaintiff is alleging that there are four classifications that are being treated differently: new television manufacturers; old television manufacturers; manufacturers of other CEDs; and manufacturers of non-CEDs.

### 1.    Television Manufacturers Versus Other CED Manufacturers

The Equal Protection Clause "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "Thus, the threshold inquiry in any equal protection analysis is whether the defendants treated the complainant differently than others who were similarly situated." *Hart v. Westchester Cty. Dep't of Soc. Servs.*, 160 F. Supp. 2d 570, 578 (S.D.N.Y. 2001). In other words, the first question that must be answered is whether the two classes being compared are similarly situated

to each other.[13]  *See Kerrigan*, 289 Conn. at 158 ("initial inquiry is . . . whether [persons] are similarly situated for purposes of the law challenged").

> The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States.   A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill.

*Plyler v. Doe*, 457 U.S. 202, 216 (1982).

There are a number of key differences between manufacturers of televisions and manufacturers of other CEDs.  CEDs other than televisions are manufactured in industries in which manufacturers' participation in the market is sufficiently stable, and in which products' useful life is sufficiently short, such that manufacturers typically are still in business when their products enter the recycling stream, whereas televisions tend to have a longer useful life than other electronic products and television manufacturers more frequently enter and then exit the market in comparatively short periods of time.  *See*, *e.g.*, Conn. Jt. Fav. Cmte. Rpt., S.B. 582, 2008 Reg. Sess. (March 24, 2008); H.R. Proc. Tr., April 22, 2008 Reg. Sess., pp. 91-92, remarks of Representative Widlitz; Envt. Cmte. Tr., March 7, 2008, pp. 58-59, remarks of Meggan Ehert.[14]  The legislature expressed concern that these distinguishing characteristics would lead to an increased problem of "orphan" televisions being returned for recycling that were produced by a manufacturer that is no longer in business.  *See id*.

Plaintiff fails to allege the existence of any countervailing factors that would tend to demonstrate that television manufacturers and other CED manufacturers are similarly situated

---

[13] Defendant appears to concede that manufacturers of new televisions and manufacturers of old televisions are similarly situated for purposes of the E-waste Law.  Defendant does not address whether manufacturers of televisions and manufacturers of non-CEDs are similarly situated.

[14] Courts "may take judicial notice of matters of public record."  *TicketNetwork, Inc. v. Darbouze*, No. 3:15-cv-237, __ F. Supp. 3d ___, 2015 WL 5595486, at *5, 2015 U.S. Dist. LEXIS 126400, at *14 (D. Conn. Sept. 22, 2015).

for purposes of the E-waste Law.  Therefore, Plaintiff's equal protection claims predicated on the E-waste Law's differential treatment between television and other CED manufacturers must fail.

### 2.    New Versus Old Television Manufacturers

In addition to being similarly situated, an equal protection claim requires that the classes being compared received differential treatment.  *See City of Cleburne*, 473 U.S. at 439.  The Equal Protection Clause is implicated when "the state statute in question, either on its face or in practice, treat[s] persons standing in the same relation to it differently."  *Kerrigan*, 289 Conn. at 158.  Plaintiff concedes that the E-waste Law, on its face, treats both old and new television manufacturers the same, but argues that, in practice, new manufacturers' "fair share of television recycling costs is over-valued as compared to other television manufacturers considering the television types and brands that are actually in Connecticut's e-waste stream."[15][16]  Doc. No. 24 at 35 n.21.

In short, Plaintiff's argument is essentially that (1) the use of the weight of the recycled televisions to determine the total cost and (2) the use of National Market Share data to allocate that cost, in effect, result in newer television manufacturers being charged more per pound of their televisions that are being recycled than the older manufacturers are paying for their televisions that are being recycled.  Construing the Complaint in the light most favorable to

---

[15] *See* Compl. ¶ 2 ("A recent study of over 23,000 pounds of televisions collected for recycling in Connecticut revealed that not a single VIZIO product was returned for recycling. However, VIZIO's National Market Share has recently been pegged by the state at over 17%, the second highest recycling obligation of any television manufacturer in the state.  Accordingly, VIZIO will pay over 17% of the total costs to recycle televisions in Connecticut, almost none of which are VIZIO products.  At the same time, however, there are large foreign television brands that currently have a small National Market Share, but have a huge Return Share in Connecticut's e-waste stream.  Such large foreign brands pay a fraction of what VIZIO pays under the E-Waste Law, and yet it is their televisions that are being recycled—not VIZIO's."); Compl. ¶ 61 ("[T]he E-Waste Law does not account for the type or amount of hazardous substances in manufacturers' televisions.  For example, CRTs contain significant quantities of lead, which is expensive to recycle, but VIZIO's flat screen televisions only contain miniscule concentrations of lead in compliance with multiple state and international regulations restricting the use of hazardous materials in consumer electronics.  Under the E-Waste Law, VIZIO is subsidizing the recycling of its older competitors' heavy and toxic CRTs.").

[16] Plaintiff also argues that the law treats intrastate and interstate manufacturers differently, but that issue has already been addressed. *See supra*, Section IV.A.1.a.

Plaintiff, Plaintiff has plausibly alleged that, as applied, the E-waste Law treats new television manufacturers differently than old television manufacturers.

As already noted, however, "in areas of social and economic policy that neither proceed along suspect lines nor infringe fundamental constitutional rights, the equal protection clause is satisfied as long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Kerrigan*, 289 Conn. at 158-59. Because in this case there is no suspect or quasi-suspect class involved and no fundamental or important right at issue, the parties appear to agree that rational basis review applies. *See id.* at 157-61.[17]

The Supreme Court has emphasized that "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (internal quotation marks and citations omitted). Accordingly, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity" and "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 319-20.

---

[17] *See also City of Cleburne*, 473 U.S. at 441-42 ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.")

In short, rational basis review is an extremely deferential standard by which to scrutinize government action.

Plaintiff argues that rational basis scrutiny is premature at this stage. However,

a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.

*Id.* at 320-21 (internal quotation marks and citations omitted).

Accordingly, some courts have explained that, in order "[t]o survive a motion to dismiss, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications. When neither the complaint nor the non-moving party's opposition negate any reasonably conceivable state of facts that could provide a rational basis for the challenged classification, a defendant's motion to dismiss an equal protection claim will be granted." *Immaculate Heart Cent. Sch. v. New York State Pub. High Sch. Athletic Ass'n*, 797 F. Supp. 2d 204, 211 (N.D.N.Y. 2011)

Defendant provides numerous "plausible reasons for [the legislature's] action," and thus "our inquiry is at an end." *Fritz*, 449 U.S. at 179. For the reasons discussed *supra*, Section IV.C.1., Connecticut's General Assembly rationally could have believed that the television

industry is different from other electronics industries, both because of the longer life span of televisions and the high-turnover nature of the participants in the industry.  Similarly, the General Assembly rationally could have believed that the market share approach would address the problems that those differences created by: (1) ensuring that no manufacturer can escape its recycling responsibilities by exiting the market before its products enter the recycling stream; (2) ensuring that there is a financing mechanism in place for any orphans that may exist; and (3) reducing the costs associated with identifying and processing the larger proportion of orphan devices that the television industry generates.  *See* Def.'s Mem. of Law in Supp. of Mot. to Dismiss [Doc. No. 21-1] at 35-36.

Plaintiff fails to negate any of these, or any other, conceivable rational bases for the lines drawn in the E-waste Law.  Instead, Plaintiff argues, without any legal authority, that rational basis scrutiny is premature because "it is ultimately a merits question."  Doc. No. 24 at 35. Plaintiff argues that it has alleged sufficient facts that show other approaches would be fairer and still address the same concerns as the approach the E-waste Law takes.  However, as already noted, "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."  *Vance v. Bradley*, 440 U.S. 93, 97 (1979).

### 3.     Television Manufacturers Versus Non-CED Manufacturers

Neither can this Court disturb the E-waste Law based on the fact that many electronic devices are not covered, or even explicitly exempted, by the law.  As the Supreme Court has explained, rational basis

> restraints on judicial review have added force where the legislature must
> necessarily engage in a process of line-drawing. Defining the class of persons
> subject to a regulatory requirement—much like classifying governmental
> beneficiaries—inevitably requires that some persons who have an almost equally
> strong claim to favored treatment be placed on different sides of the line, and the
> fact that the line might have been drawn differently at some points is a matter for
> legislative, rather than judicial, consideration.

*Beach Commc'ns*, 508 U.S. at 315-16 (internal quotation marks and citations omitted). The

necessity of legislatures having "to draw the line somewhere . . . renders the precise coordinates

of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed

leeway to approach a perceived problem incrementally." *Id.* at 316. *See also Williamson v. Lee

Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different

dimensions and proportions, requiring different remedies. Or so the legislature may think. Or

the reform may take one step at a time, addressing itself to the phase of the problem which seems

most acute to the legislative mind. The legislature may select one phase of one field and apply a

remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no

further than the invidious discrimination.").

### 4.   Conclusion

The Court finds that there are no allegations that plausibly show television manufacturers

and other CED manufacturers are similarly situated for purposes of the E-waste Law. The Court

further finds that, with respect to new television manufacturers, old television manufacturers, and

electronics manufacturers not covered by the E-waste Law, Plaintiff has not alleged any facts or

made any arguments to show that there is no plausible policy reason for these classifications, or

that the governmental decisionmaker could not rationally have considered the legislative facts on

which it apparently based its classifications to be true, or that the relationship of the

classifications to the E-waste Law's goal is so attenuated as to render the distinction arbitrary or

irrational.  Accordingly, Plaintiff's equal protection claims under the Fourteenth Amendment and the Connecticut Constitution shall be dismissed for failure to state a claim.

### D.      SUBSTANTIVE DUE PROCESS CLAIMS

The United States Constitution provides, "[N]or shall any state deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amdt. XIV, § 1.  The Connecticut Constitution similarly provides, "No person shall be . . . deprived of life, liberty or property without due process of law," and "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."  Conn. Const. art. I, §§ 8, 10.  These provisions "guarantee more than fair process, and [] cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them."  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal quotation marks and citations omitted).  Count 5 of the Complaint alleges that Defendant's enforcement of the E-Waste Law has deprived Plaintiff of its rights to substantive due process as guaranteed by the federal and State constitutions.

Under federal substantive due process analysis, the Court must "review laws adjusting the benefits and burdens of economic life for arbitrariness and irrationality."  *In re Chateaugay Corp.*, 53 F.3d 478, 486 (2d Cir. 1995).  If a law burdens no fundamental rights, it "is a classic example of an economic regulation and is subject only to the minimum scrutiny rational basis test.  Substantive due process requires only that economic legislation be supported by a legitimate legislative purpose furthered by a rational means."  *Id.* at 486-87.  The approach under the Connecticut Constitution is the same.

> Like the federal constitution, substantive due process analysis under the state constitution provides for varying levels of judicial review to determine whether a

state statute or regulation passes constitutional muster in terms of substantive due process. . . . Constitutional challenges to ordinary economic or social welfare legislation require us to employ a rational basis test to ascertain whether the legislature has acted arbitrarily or irrationally.

*Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 408 (2015).

As in the equal protection context, rational basis review for substantive due process claims is very deferential. "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

With respect to its due process claims, Plaintiff alleges:

- "The E-Waste Law has deprived and continues to deprive VIZIO of liberty and property without substantive due process of law." Compl. ¶ 108.

- "There is no rational relation between the financial burden imposed upon VIZIO by the E-Waste Law and VIZIO's actual contribution to the e-waste stream in Connecticut." Compl. ¶ 109.

- "The obligation imposed on VIZIO to fund in-state CED recycling in Connecticut in proportion to its National Market Share is arbitrary, irrational, and lacks any plausible rational basis." Compl. ¶ 110.

- "The E-Waste Law is retroactive in that it imposes new liability on manufacturers, including VIZIO individually, for past transactions. The mandate to fund the recycling of CEDs purchased prior to the enactment of the E-Waste Law is arbitrary, irrational, and lacks any plausible rational basis." Compl. ¶ 111.

Because Plaintiff has alleged that the E-waste Law has both retroactive and prospective provisions that violate its due process rights, the Court must conduct two distinct reviews. *See Usery*, 428 U.S. at 17 ("The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former."); *Rojas-Reyes v. I.N.S.*, 235 F.3d 115, 122-23 (2d Cir. 2000) ("The test therefore is

one of rationality as applied independently to the prospective and retrospective aspects of the law.").[18]

### 1. Existence of Retroactive Provisions

In addressing whether the E-waste Law's retroactive provisions violate Plaintiff's due process rights, the Court first must determine whether the law has any retroactive provisions. "[D]eciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Landgraf v. USI Film Products*, 511 U.S. 244, 268 (1994).

> A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law.  Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment.  The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.  Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity.  However, retroactivity is a matter on which judges tend to have sound instincts, and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at 269-70 (internal quotation marks and citations omitted).

Plaintiff argues that the E-waste Law attaches a new legal consequence, *i.e.*, a requirement to pay for recycling of television sets, to an event completed before the law's

---

[18] In addition, for the first time at oral argument, Plaintiff raised a substantive due process argument predicated on the "unitary business rule" described in *Allied-Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768 (1992). Because this argument was not raised in any of Plaintiff's briefs, Defendant had no occasion or opportunity to respond to it.  Accordingly, "[t]his Court need not consider an argument raised for the first time at oral argument." *Harris v. Wu-Tang Prods., Inc.*, No. 05-cv-3157, 2006 WL 1677127, at *3, 2006 U.S. Dist. LEXIS 40527, at *10 (S.D.N.Y. June 16, 2006); *cf. Schiavone v. Ne. Utilities Serv. Co.*, No. 3:08-cv-429, 2009 WL 801744, at *2 n.2, 2009 U.S. Dist. LEXIS 24517, at *4 n.2 (D. Conn. Mar. 25, 2009) (observing that "[c]ourts generally disregard arguments raised" for the first time in a reply brief).  The Court notes, however, that the unitary business rule, which deals with restrictions on a state's ability to tax the income of businesses, does not appear, in any way, to support the finding of a substantive due process violation in this case.  The recycling charges assessed to television manufacturers under the E-waste Law certainly are not a tax on their incomes.  Neither are they a tax assessed on the sales of their products, whether sold in Connecticut or out of state.  Rather, the E-waste Law requires manufacturers to pay for the actual cost of the televisions being recycled in Connecticut.  There being no income taxation involved in this case, *Allied-Signal* would appear to be inapposite.  Therefore, even if it were properly before this Court, this theory would not save Plaintiff's substantive due process claims.

enactment, *i.e.*, past manufacturing of televisions.  The degree of connection between these two, however, is very weak.  The requirement to pay for the recycling of television sets in the present is not a consequence of manufacturing television sets in the past.  Rather, this requirement is a direct consequence of two types of events occurring after the enactment of the E-waste Law: (1) the current recycling of e-waste; and (2) the current sales of newly-manufactured televisions. None of the liability is directly tied to events occurring in the past, and all television manufacturers have fair notice that their share of the recycling costs in Connecticut will be tied to their sales of televisions being manufactured now and in the future.

Accordingly, the Court concludes that there is no plausible basis to conclude that the E-waste Law has a retrospective aspect.  In addition, even if it did have a retrospective aspect, the E-waste Law would survive rational basis review of that aspect, for the reasons discussed *infra*, Section IV.D.2.

## 2.    Rational Basis Review

Plaintiff does not dispute that the State has a legitimate legislative purpose behind the E-waste Law.  *See*, *e.g.*, Compl. ¶ 1 (". . . VIZIO is a firm believer in electronic waste ('e-waste') recycling and supports a law requiring television brand-owned sellers to pay for the recycling of televisions . . . .").  Rather, Plaintiff argues that the legitimate purpose is not furthered by a rational means, such that the legislature has acted arbitrarily or irrationally in enacting the E-waste Law.  *See* Compl. ¶¶ 109-11.

In terms of the prospective aspects of the E-waste Law, Plaintiff argues that it is premature to engage in rational basis review, and that Plaintiff must be afforded discovery so that it could demonstrate that the costs imposed by the E-waste Law are unrelated to the health and

safety interests asserted by the State.  Doc. No. 24 at 31-32.  This misapprehends the rational

basis standard.  Under rational basis review, a court

> will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, because the problem could have been better addressed in some other way, or because the statute's classifications lack razor-sharp precision.  Nor will a statute be overturned on the basis that no empirical evidence supports the assumptions underlying the legislative choice.  To succeed on a claim such as this, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997).

Defendant presents a number of conceivable bases supporting the use of National Market

Share and the total weight of the televisions returned for recycling for determining the cost

allocations.  *See* Doc. No. 21-1 at 5, 37-40.  For example, current market share arguably ties each

television manufacturer's costs directly to the number of its televisions currently entering the

Connecticut market, and because the E-waste Law requires that all of those televisions must be

recycled when they eventually are discarded, Plaintiff's costs under the E-waste Law arguably

will be directly related to its own contribution to the e-waste problem in the long run.  *See id.* at

5, 37.  Plaintiff argues that the Court should deny the motion to dismiss the due process claims

because the E-waste Law's formula for allocating recycling costs (1) does not correlate to the

number of VIZIO televisions entering the Connecticut market because VIZIO's market share in

Connecticut is less than its National Market Share; (2) is not indicative of the amount of VIZIO

televisions being recycled in Connecticut; and (3) will not "balance out" recycling costs over

time because VIZIO's flat-screen televisions weigh less and cost less to recycle than the CRT

televisions currently being recycled.  *See* Doc. No. 24 at 31-32.

Rational basis scrutiny is a "deferential standard of review," under which "a plaintiff must overcome the strong presumption of rationality that attaches to a statute." *Alliance I*, 984 F. Supp. 2d at 60. A court is "required to uphold" a challenged statutory provision "if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (internal quotation marks omitted). On the other hand, in order to prevail, a plaintiff "must negative every conceivable basis which might support" the provision. *Id.* (internal quotation marks omitted). Thus, even if Plaintiff provides evidence demonstrating clearly that the costs imposed on it are, in practice, completely unrelated to the health and safety interests asserted by Connecticut, and even if Plaintiff's "[d]iscovery and expert opinion will clearly demonstrate that the State's E-Waste Program for televisions has been dominated by CRTs and that recycling of CRTs has produced disastrous results that undercut the putative benefits of the program," Doc. No. 30 at 10, it would be of no constitutional significance, as none of these facts would go to demonstrating that the purported bases supporting the challenged provisions of the E-waste Law could not reasonably have been conceived to be true by the State, but only that they turned out not to be true.[19]

In short, Plaintiff's due process claims must fail because it has not alleged facts or advanced arguments that could plausibly demonstrate that the State's justifications are inconceivable.

> [I]t is well settled that the Government has no duty to produce evidence to sustain a validly enacted statute's rationality. Indeed, absent suspect classifications or impingement on fundamental rights, state legislative decisionmaking is not subject to a federal court's factfinding. In the area of economics or social welfare, legislation need not be effective or even logically consistent, in every respect,

---

[19] Plaintiff cites three cases in which courts found a statute had failed rational basis review, but they are distinguishable from this case. The plaintiffs in those cases alleged facts that could plausibly be construed to demonstrate that the respective governmental decisionmakers had no conceivable basis for their challenged laws. *See Dias v. City & County of Denver*, 567 F.3d 1169, 1183-84 (10th Cir. 2009); *Dwen v. Barry*, 483 F.2d 1126, 1130-31 (2d Cir. 1973), *Bass Plating Co. v. Town of Windsor*, 639 F. Supp. 873, 879-80 (D. Conn. 1986).

with its articulated aims in order to survive federal due process review.  It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

*Alliance I*, 984 F. Supp. 2d at 61.[20]

The same is true for any arguably "retroactive" aspects of the E-waste Law.  "[T]he legislative purpose can be the same for a law's prospective and retrospective aspects; the purpose need only be rational in both applications to be constitutional." *Rojas-Reyes*, 235 F.3d at 122. Furthermore, "the strong deference accorded [economic] legislation . . . is no less applicable when that legislation is applied retroactively.  Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches[.]" *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

As with the rational basis review of the prospective aspects of the E-waste Law, Plaintiff has failed to point to any allegations or arguments that would show that there are no reasonably conceivable bases for the "retroactive" provisions.  Given the relatively lengthy life span of televisions and the relatively high turnover of industry participants, it was conceivable that some portion of the televisions being recycled today will have been manufactured by companies no longer in existence and therefore no longer available to pay for the cost.  It was also conceivable that televisions being discarded in the future may have been manufactured and sold today by companies that will no longer be in existence by that time.  Because it thus was conceivable that it would reflect roughly each manufacturer's contribution to the e-waste problem over time,

---

[20] *See also Martinez v. Mullen*, 11 F. Supp. 3d 149, 160 (D. Conn. 2014) ("It is not enough for the challenger to show that the government was actually mistaken in its factual assumptions or reasoning, that the restriction at issue was supported by 'rational speculation' rather than empirical evidence, that the 'rational basis' for the restriction or classification was not the rationale the legislature had in mind, or that the restriction adopted is over-inclusive or underinclusive. A statute suffering from all of these flaws may still survive rational basis scrutiny.  In short, while a few courts have stated that rational basis review is not meant to be toothless, the teeth are dull and the bite rare.") (internal quotation marks and citations omitted).

while addressing the problem of recycling televisions for manufacturers no longer in existence, there was a rational basis to use current National Market Share data to allocate the current recycling costs.  In addition, it was conceivable that it would be costly and complicated for CERs to separate and track televisions turned in for recycling by brand, and conceivable that including such a requirement in the E-waste Law would reduce its effectiveness at achieving its health and safety purposes.

As noted above, Plaintiff argues that the costs will not "balance out" over time because televisions being manufactured today are lighter than the older ones that are being recycled now, but does not allege any facts or advance any arguments that could plausibly show that such a balancing out would be inconceivable.  Plaintiff also argues that the "retroactive" aspects of the E-waste Law were not foreseeable at the time Plaintiff was formed, that it is inequitable to impose on Plaintiff the cost of recycling old competitors' products, and that the liability is disproportionate to the amount of Plaintiff's products that will ever be part of Connecticut's waste stream.  *See* Doc. No. 24 at 29-31.  However, "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope. Retroactivity provisions often serve entirely benign and legitimate purposes."  *Landgraf*, 511 U.S. at 267-68.

Therefore, while the Court concludes that the E-waste Law does not contain any retroactive provisions, it holds that, even if it did, those provisions would survive rational basis review.

### 3.    Conclusion

The Court finds that there are no allegations to show plausibly that the E-waste Law is retroactive.  The Court further finds that Plaintiff has not alleged any facts or made any

arguments to show plausibly that the State could not rationally have considered the legislative facts on which it based the E-waste Law to be true, or that the challenged provisions are arbitrary or irrational.  Accordingly, Plaintiff's due process claims under the Fourteenth Amendment and the Connecticut Constitution shall be dismissed for failure to state a claim.

## V.   CONCLUSION

For the foregoing reasons, the Complaint is dismissed in its entirety.  The dormant Commerce Clause claim based on an extraterritoriality theory is dismissed without prejudice, and Plaintiff may replead it consistent with the holdings of this Ruling.  Any amended complaint shall be filed within thirty days of this Ruling.

All of the other constitutional claims are dismissed with prejudice because amendment of the Complaint would be futile.  *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (affirming dismissal with prejudice because, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of [the district court's] discretion to deny leave to amend"); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08-cv-7508, 2009 WL 3346674, at *2, 2009 U.S. Dist. LEXIS 96114, at *5 (S.D.N.Y. Oct. 15, 2009) ("A court has discretion to dismiss with prejudice if it believes that amendment would be futile or would unnecessarily expend judicial resources.") (internal quotation marks omitted).

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March, 2016.


   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge