## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VIZIO, INC.,
     Plaintiff,

    v.

ROBERT KLEE, in his official capacity as
the Commissioner of THE STATE OF
CONNECTICUT DEPARTMENT OF
ENERGY AND ENVIRONMENTAL
PROTECTION,
     Defendant.

No. 15-cv-929 (VAB)

## ORDER ON MOTION TO DISMISS

Plaintiff, VIZIO, Inc. ("VIZIO"), brought this action against Defendant, the Commissioner of the State of Connecticut Department of Energy and Environmental Protection, challenging the constitutionality of Connecticut's E-Waste Law.  ECF No. 1.

Defendant previously filed a motion to dismiss under Rule 12(b)(6), arguing that VIZIO had failed to state a claim upon which relief could be granted.   ECF No. 21.  The Court granted the motion to dismiss the Complaint in its entirety, dismissing all of VIZIO's claims with prejudice, except for a Dormant Commerce Clause claim based on an extraterritoriality theory.  ECF No. 36.  The Court gave Plaintiff leave to amend its Complaint, but only to the extent of adding factual allegations supporting a claim that the E-Waste Law directly controls Plaintiff's interstate prices. *Vizio, Inc. v. Klee*, No. 3:15-CV-00929 (VAB), 2016 WL 1305116, at *15 (D. Conn. Mar. 31, 2016).

VIZIO then amended its complaint.  ECF No. 41.  Defendant now moves to dismiss the Amended Complaint under Rule 12(b)(6), arguing that VIZIO has failed to plead that the E-

1

Waste law directly controls interstate prices and therefore has failed to state a claim upon which relief could be granted.  ECF No. 44.

For the reasons that follow, the Court **GRANTS** Defendant's renewed motion to dismiss because Plaintiff has failed to plead factual allegations that the E-Waste Law directly controls Plaintiff's interstate prices.

## I.    FACTUAL ALLEGATIONS

The factual background of this case is described in greater detail in the Court's prior order granting Defendant's first motion to dismiss.  *See Vizio*, 2016 WL 1305116, at *2-4.  In the interests of clarity, the Court also summarizes the relevant background of the case below.

VIZIO is an American company that manufactures television sets.  Amend. Compl. ¶ 1, ECF No. 41.  VIZIO was incorporated in late 2002, and first entered the television market in 2003.  *Id.* ¶ 32.  As a result of its relatively recent incorporation, VIZIO has only distributed flat panel televisions, not the bulkier cathode ray tube ("CRT") or rear projection televisions that were common several decades ago.  *Id.* ¶ 3.

In July 2007, Connecticut enacted Public Act No. 07-189, which has been amended several times and is codified at Conn. Gen. Stat. Ann. §§ 22a-629 through 22a-640.  The Connecticut Department of Energy and Environmental Protection ("DEEP") subsequently promulgated regulations, located at Conn. Agencies Regs. Sections 22-a-630(d)-1 and 22-a-638-1 (collectively, the "E-Waste Law").  DEEP is responsible for administering the E-Waste Law, which applies to each manufacturer of covered electronic devices ("CEDs").  Conn. Gen. Stat. § 22a-630(a).  VIZIO is considered a "manufacturer" under this statute.  *See* Conn. Gen. Stat. §§ 22a-629(7), (11).

Under the E-Waste Law, each manufacturer must register with DEEP and participate in the program to implement and finance the collection, transportation, and recycling of CEDs. The administration of the E-Waste program is funded by registration fees. The initial registration fee for every manufacturer is at least $5,000. Television manufacturers, such as VIZIO, must then pay subsequent annual registration fees that are based on a sliding scale that is representative of the manufacturer's current share of sales in the national television market ("National Market Share").

The E-Waste Law uses a "market share" approach to calculate each television manufacturer's costs under the E-Waste program. Under this approach, the manufacturer's costs are based on a percentage of the total weight of all televisions that are recycled in a given period, regardless of brand, multiplied by a specified price per pound. The percentage of the total weight of all televisions that each manufacturer is responsible for is based on its current National Market Share ("National Market Share provision").

According to DEEP, VIZIO's billable national market share is currently 17.16%. Amend. Compl. ¶ 34. DEEP previously determined VIZIO's billable market share to be 14.33% in 2013, 14.52% in 2014, and 16.088% in 2015. *Id.* VIZIO was, therefore, charged $414,823.54 in 2013, $585,669.23 in 2014, and $647,141.72 in 2015 under the E-Waste Law. As of December 31, 2015, VIZIO has spent over $2.5 million to comply with Connecticut's E-Waste program. *Id.*

Almost all of VIZIO's sales are to large retailers, and these sales generally take place in states where the retailers have distribution operations, such as New York. Amend. Compl. ¶ 33. After the retailers purchase the televisions, they distribute them, at their own discretion, to

various locations throughout the country for resale to individual customers. *Id.* VIZIO claims that it does not sell to any distribution centers in Connecticut. *Id.* ¶ 34.

A.      **E-Waste Law and Interstate Television Prices**

Plaintiff's Amended Complaint brings the following new factual allegations that it claims will support the dormant commerce clause extraterritoriality claim and the allegation that the National Market Share provision of the E-Waste law directly "has controlled and will continue to control interstate television prices." Amend. Compl. ¶ 47.

First, Plaintiff alleges that the E-Waste Law imposes substantial and disproportionate costs on low average-cost television producers, like VIZIO, because the National Market Share provision "most severely penalizes manufacturers that have the highest National Market Shares." Amend. Compl. ¶ 49. Plaintiff alleges that the E-Waste law directly forces low average-cost producers to raise their television prices, using the theory described below. *Id.*

According to VIZIO, the television industry is a highly competitive market. Amend. Compl. ¶ 50. The largest competitors in that market, therefore, must be able to "implement and sustain aggressive pricing strategies." *Id.* VIZIO alleges that, in this competitive market, "low average cost producers drive down and establish minimum prices" because such producers "can produce their products at the lowest cost given competitive advantages such as economies of scale or technological capabilities. *Id.* ¶ 51. Low-average cost producers' prices allegedly are "directly correlated to the minimum of their average costs." *Id.* ¶ 52.

VIZIO then advances certain economic theories, arguing that "[t]here will always be at least one low average-cost producer in a competitive market that drives the overall minimum market price" because "[o]ther firms with higher average costs cannot consistently undercut the low average-cost producers' prices" without incurring losses and risking going out of business.

Amend. Compl. ¶ 53.  Firms with higher average costs generally choose to charge higher prices "to avoid losses and stay in business," which "inevitably" allows a low average-cost producer to set the overall minimum market price.  *Id.*

VIZIO further alleges that, because of their "competitive advantages," i.e. low costs of production and therefore low price, low average-cost producers will have the highest National Market Shares.  Amend. Compl. ¶ 54.  When a large manufacturer, like VIZIO, increases their prices, their National Market Share declines.  *Id.*  According to VIZIO, this means that there is a "direct relationship between National Market Share and price."  *Id.*

By setting each manufacturer's costs based on its National Market Share, the National Market Share provision allegedly puts a "grossly disproportionate" share of the Connecticut E-Waste program's costs on to low-average cost producers, like VIZIO, because of the large National Market Shares they obtain through their low prices.  Amend. Compl. ¶ 55. Because the costs imposed on television manufacturers are based on National Market Share, the E-Waste law may impose costs that are disproportionate to a manufacturer's in-state market share.  *Id.* ¶ 56.  VIZIO's National Market Share in 2013 was, for instance, 25% to 50% higher than it's Connecticut state market share.  *Id.*

VIZIO alleges that the E-Waste Law's imposition of disproportionate costs on low-average cost producers – producers with a high national market share because of low prices due to  having low-average costs – is the mechanism by which the E-Waste Law "has controlled" VIZIO's pricing in the national marketplace.  Amend. Compl. ¶¶ 56-57.  VIZIO then argues that when low-average cost producers raise their prices, the "minimum price floor for televisions nationwide" is then driven up because when low-average cost producers have increased their prices, other manufacturers have followed suit.  *Id.* ¶ 57.

Connecticut is, allegedly, one of at least 11 states that have enacted a National Market Share-based approach for allocating e-waste recycling costs.  Amend. Compl. ¶ 58.

### B. Connecticut Legislature and the Alleged Control of Interstate Television Prices

Plaintiff further alleges that the legislative history behind the E-Waste Law shows that the Connecticut General Assembly "intended to control national television prices to maintain pricing parity with neighboring states," and intended to "shift the costs of the E-Waste Law to out-of-state consumers."  Amend. Compl. ¶ 59.

According to VIZIO, when Connecticut legislators were debating the E-Waste Law, some allegedly expressed concern that manufacturers could pass on the costs of the E-Waste Law to Connecticut consumers by charging higher prices.  Amend. Compl. ¶¶ 59-60.  As some legislators noted, if manufacturers passed on the costs to Connecticut consumers, customers would go to other states, such as Massachusetts, to purchase electronics.  *Id.* ¶ 60.  Thus, some legislators noted that one main goal of the e-waste recycling program was to have it be "free of cost" to Connecticut consumers.  *Id.* ¶ 61.  VIZIO alleges that when the legislature enacted the E-Waste Law, they did so knowing that there would be "costs somewhere" that "someone will pay."  *Id.* ¶ 62.

VIZIO's Amended Complaint does not state exactly how the E-Waste Law was intended to accomplish any of the above goals, whether to (a) prevent manufacturers from passing on the costs to Connecticut consumers specifically, (b) ensure that the program was actually free of costs to Connecticut consumers, or (c) pass the costs "somewhere" to "someone."  The Amended Complaint instead points to two theories of how the E-Waste Law may accomplish these goals. Amend. Compl. ¶¶ 63-64.

First, VIZIO claims that the Connecticut legislature "attempted to minimize price increases in Connecticut by restricting access to the E-Waste Program to in-state residents." Amend. Comp. ¶ 63.  The program only covers the costs when Connecticut residents recycle their old electronics.  *Id.*

Second, VIZIO claims that the Connecticut legislature "intended for the E-Waste Law to be part of a 'compact' among New England states that would enact similar statutory schemes for recycling e-waste."  Amend. Compl. ¶ 64.  VIZIO further claims that the legislature "intended to participate in this regional 'compact' in order to control interstate television prices by ensuring that television prices would be uniform across New England" so that Connecticut retailers would not be harmed by consumers traveling out of state to purchase televisions.  *Id.*  The Amended Complaint offers no further explanation of whether other states enacted identical or substantially similar National Market Share provisions.  It also does not explain how the statutes at issue actually controlled prices across the different states.

### C.    Factors Allegedly Magnifying Extraterritorial Price Control Effect of E-Waste Law

Plaintiff also argues that, because the National Market Share provision ties the costs that DEEP charges the television manufacturer to the manufacturer's National Market Share, the E-Waste Law allocates costs in an "unequal, disproportionate, and arbitrary manner."  Amend. Compl. ¶ 65.  Plaintiff claims that this "unequal" and "inefficient" system "exacerbates the E-Waste Law's extraterritorial control on television prices," basing this claim on the following three theories.  *Id.* ¶ 66.

First, VIZIO claims that, because manufacturers are charged E-Waste program costs based on National Market Share rather than the quantity of the manufacturer's products that are recycled in Connecticut, the E-Waste Law forces certain manufacturers to "pay the costs of

recycling other manufacturers' televisions."  Amend. Compl. ¶ 67.  This apparently "prevents manufacturers from establishing their own wholesale prices based on the cost of recycling their own products."  *Id.*  VIZIO alleges that the National Market Share provision is, therefore, a mechanism of "out-of-state pricing impacts and control," but does not explain why.  *Id.*

As a manufacturer that has only made flat-screen televisions, VIZIO implies that it will bear particularly disproportionate E-Waste program costs because approximately 77 million of the bulkier, older model CRT televisions remain in use in this country and will "continue to enter state waste streams for at least the next 15 years.  Amend. Compl. ¶ 67.  Both because of the quantity of CRT televisions remaining, as well as their being "heavier, more difficult to disassemble, and contain[ing] more hazardous substances" than newer televisions, VIZIO contends that the cost of recycling CRT televisions, which they have never manufactured, "represent the dominant share of e-waste recycling costs."  *Id.*

Second, VIZIO alleges that the E-Waste Law is "fail[ing] to further any health or safety interest" because it is resulting in the "stockpiling," rather than the actual recycling of old electronics.  Amend. Compl. ¶ 68.  According to VIZIO, the entities responsible for actually recycling the old electronics are failing to do so in accordance with state and federal laws.  *Id.*  Instead, VIZIO alleges that electronics brought in for recycling are either being stockpiled in warehouses or sent overseas, where they may "not be[] handled and processed in accordance with U.S. and international laws."  *Id.*  VIZIO does not, however, attempt to connect this allegation to price controls on VIZIO.

Third, VIZIO alleges that the "interstate price control impacts" of the National Market Share provision are "magnified by numerous other aspects of the E-Waste laws that impose costs on manufacturers" and allegedly do so disproportionately heavily to low average-cost producers

like VIZIO.  Amend. Compl. ¶ 70.  VIZIO lists a few alleged impacts of the E-Waste Law, most
of which are also alleged in earlier parts of the complaint.  *Id.*  The new allegations are that the
E-Waste Law "favors in-state commercial interests" and "imposes a surcharge on out of state
sales."  *Id.*  This paragraph does not include any additional explanation of which specific
provisions of the E-Waste Law cause these effects, or how the E-Waste Law causes these effects.

### D.     The Alleged Unavoidability of E-Waste Law Price Control Impacts

Finally, Plaintiff also alleges that, to the extent that the above allegations "demonstrate
that the E-Waste Law had the practical effect of controlling interstate prices," manufacturers are
unable to avoid those effects.  Amend. Compl. ¶ 70.  Television manufacturers covered by the
National Market Share provision cannot avoid Connecticut's E-Waste Law "absent a complete
withdrawal of the manufacturer and its products from the recycling stream," which VIZIO
alleges is "impossible."  *Id.*  VIZIO therefore argues that television manufacturers have no way
of complying "with the law in a manner that would avoid its extraterritorial reach" because the
costs that a manufacturer must pay to Connecticut's E-Waste Program is necessarily tied to
National Market Share.  *Id.*

According to VIZIO, it and other low average-cost producers' "cannot avoid raising
prices for televisions by absorbing the costs of the E-Waste Law."  Amend. Compl. ¶ 71.  This is
allegedly because the low average cost producers' revenue margins, in the competitive television
market, are too narrow to absorb the costs of the E-Waste Law.  *Id.*

VIZIO further alleges that it would be "impossible" for it and other low average-cost
producers' to "avoid higher national prices" and pass on the costs only to Connecticut
consumers.  Amend. Compl. ¶ 72.  VIZIO provides four reasons to support this point.

First, VIZIO claims that even if it raised prices only for Connecticut consumers, its National Market Share would remain high, even if its in-state Connecticut market share decreased, resulting in VIZIO and other low average-cost producers "recover[ing] a lower amount of their E-Waste Program costs directly from Connecticut consumers and a higher amount" of the costs "from non-Connecticut consumers."  Amend. Compl. ¶ 72.  According to VIZIO, any price increase that a manufacturer applied only to Connecticut consumers would result in Connecticut consumers purchasing fewer of that manufacturer's televisions.  *Id.*  VIZIO also argues that the Connecticut state legislature correctly predicted that some in-state consumers could react to higher prices in Connecticut by simply going to neighboring states to purchase the same television.  *Id.*  Thus, the manufacturer's increased Connecticut prices would have a negligible impact on a low average-cost producer's National Market Share because of "the small size of the Connecticut market."  *Id.*  VIZIO therefore argues that, regardless of whether it passes on costs to Connecticut customers, it would still be forced to pay high E-Waste Program costs based on its high National Market Shares, which allegedly requires "increased shifting of costs out-of-state."  *Id.*

Second, VIZIO argues that if it or other low average-cost television producers raised prices only for Connecticut customers, the "inevitable result would be a 'death spiral' in which the low average-cost producers sell increasingly fewer televisions in Connecticut and pass on increasingly higher E-Waste Program costs per [in-state] sale."  Amend. Compl. ¶ 73. This is allegedly because the producer's National Market Share would likely hold steady, as would the producer's E-Waste Program costs, because Connecticut is a small market and its consumers could go to a neighboring state to purchase the television, while the number of customers purchasing the producer's televisions in Connecticut would decrease due to the passed-on cost.

*Id.* ¶ 72.  Over time, VIZIO alleges, the prices for customers buying in Connecticut would "escalate to a point at which no sale could be consummated" in Connecticut.  *Id.* ¶ 73.  VIZIO concludes that this proves that "the only way for low average-cost producers to recover their E-Waste Program costs is to raise their national television prices" because the "costs cannot be recovered solely from in-state sales."  *Id.*

Third, VIZIO claims that it is impossible for television manufacturers to pass on E-Waste program costs only to Connecticut customers or transactions or to prevent products from being sold in Connecticut.  Amend. Compl. ¶ 74.  "As a practical matter" distributors do not enter into agreements with television manufacturers that "force the distributor to sell a manufacturer's televisions at a minimum price."  *Id.*  Additionally, VIZIO claims that television manufacturers cannot "preclude sales (or resales) of VIZIO televisions in Connecticut by contract" or otherwise dictate where distributors sell manufacturers; products."  *Id.*  VIZIO does not explain these points further, but concludes that it means that manufacturers cannot avoid Connecticut E-Waste Program costs because of the National Market Share provision.  *Id.*

Fourth, VIZIO concludes by adding an additional allegation that, even if VIZIO could cause there to be a "significant barrier" to VIZIO products being sold in Connecticut, it would "represent a total disruption of the flow of goods in interstate commerce" and "result in a form of economic balkanization."  Amend. Compl. ¶ 75.  VIZIO alleges that this would, "itself create a separate dormant Commerce Clause violation."  *Id.*

## II.     THE COURT'S PREVIOUS ORDER

This case concerns Plaintiff's challenge to the constitutionality of Connecticut's E-Waste law.  Plaintiff originally challenged Connecticut's E-Waste law as being unconstitutional under the Commerce Clause of the United States Constitution; the Takings Clause of the Fifth

Amendment of the United States Constitution and under Article I, Section 11 of the Connecticut

Constitution; the Equal Protection Clause of the Fourteenth Amendment of the United States

Constitution and under Article I, Section 20 of the Connecticut Constitution; and under the due

process rights component of the Fourteenth Amendment of the United States Constitution and

under Article I, Section 8 of the Connecticut Constitution.  *See Vizio*, 2016 WL 1305116, at *1.

The Court granted Defendant's motion to dismiss the Complaint on all counts, dismissing all

counts with prejudice, save for "Plaintiff's claim for violation of the Dormant Commerce Clause

under an extraterritoriality theory," which was dismissed without prejudice.  *Id.*

   As the Court's previous order explains, the extraterritoriality prong of the dormant

Commerce Clause jurisprudence prohibits laws that "ha[ve] the practical effect of

'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in

question."  *Vizio*, 2016 WL 1305116, at *5 (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d

205, 216 (2d Cir. 2004) ("*Freedom Holdings I*")).  The Court dismissed Plaintiff's claim under

the extraterritoriality prong of the dormant Commerce Clause, as it did all of the Plaintiff's other

claims.  The Court, however, allowed Plaintiff leave to re-plead facts supporting one specific

theory of the E-Waste Law's alleged unconstitutionality under the extraterritoriality theory of the

dormant Commerce Clause, namely, that the National Market Share provision operates to

directly control the interstate prices of VIZIO's televisions.  *See id.* at *15.  In allowing Plaintiff

to re-plead this claim, the Court noted that Plaintiff would need "to add factual allegations from

which the Court could reasonably infer that the National Market Share provision of the E-waste

Law has the practical effect of directly controlling the interstate prices of its televisions."  *Id.*

   The Court also cautioned that "additional factual allegations showing that the E-waste

law merely affects the prices charged by Plaintiff will not suffice to state a claim for violation of

the dormant Commerce Clause under an extraterritoriality theory" that is sufficient to survive Defendant's renewed motion to dismiss. *Vizio*, 2016 WL 1305116, at *15. This is because "mere upstream pricing impact is not a violation of the dormant Commerce Clause." *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 67 (2d Cir. 2010) ("*Freedom Holdings II*") (internal quotation marks omitted).

## III.    STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (internal citations omitted). When deciding a Rule 12(b)(6) motion to dismiss, a court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at

555, 557 (2007). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

## IV.   DISCUSSION

In the Court's previous order granting Defendants' previous motion to dismiss, the Court permitted Plaintiff to bring an amended complaint raising a dormant Commerce Clause claim based on the extraterritoriality theory and with factual allegations sufficient to show that the National Market Share provision of the E-Waste Law has the practical effect of directly controlling the interstate prices of its televisions." *Vizio*, 2016 WL 1305116, at *15.

Plaintiff brings an Amended Complaint containing this claim, which seeks a declaratory judgment and preliminary injunctive relief on the basis that the E-Waste law violates the Dormant Commerce Clause because it "has an extraterritorial reach that has the practical effect of controlling manufacturers' conduct and regulating goods in commerce beyond the boundaries of the state."  Amend. Compl. ¶¶ 79-83. Defendant now moves, under Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint for failure to state a claim.  ECF No. 44.  Specifically, Defendants argue that the Amended Complaint fails to allege facts adequate to show that the E-Waste Law directly controls interstate prices.  Def. Br. At 1, ECF No. 44-1.

The law applicable to the dormant Commerce Clause extraterritoriality claim based on a theory that the E-Waste law controls interstate prices was summarized in the Court's previous order granting Defendant's previous motion to dismiss. *See Vizio*, 2016 WL 1305116, at *9-12. The law relevant to this claim is also discussed below.

The extraterritoriality theory is "the most dormant doctrine in dormant commerce clause jurisprudence." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1170 (10th Cir.), *cert. denied*, 136 S. Ct. 595 (2015) ("*EELI*"). Indeed, a Supreme Court "majority has used its extraterritoriality principle to strike down state laws only three times." *Id.* at 1173; *see also Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935).

In *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989), the most recent in this line of cases, the Supreme Court held that "a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states." *Healy*, 491 U.S. at 336 (internal quotation marks omitted). The *Healy* Court also recognized that the practical effects of a challenged state statute "must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* at 336.

Following *Healy*, the Second Circuit concluded, in *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ("*Grand River*"), that the plaintiff's dormant Commerce Clause claim should have survived a motion to dismiss. *Grand River*, 425 F.3d at 173. In *Grand River*, the Second Circuit noted that *Healy* "recognized a potential problem where multiple states decide to enact 'essentially identical' statutes in the pricing-parity context," and "worried about potential regulatory 'price gridlock' or the 'short-circuiting of normal pricing decisions' that could result." *Id.* at 171 (quoting *Healy*, 491 U.S. at 339-40).

If Plaintiff's claim is to survive this motion to dismiss, the facts that Plaintiff alleges must be sufficient to show that, like the statutes the *Grand River* plaintiffs challenged, the Connecticut

E-Waste Law has the effect of directly controlling interstate prices.  *Vizio*, 2016 WL 1305116, at

*15.  Facts "showing that the E-waste law merely affects the prices charged by Plaintiff will not

suffice."  *Id.*  For the reasons discussed below, the Court finds that Plaintiff's Amended

Complaint contains factual allegations that support only the theory that the E-Waste Law merely

affects rather than directly controls VIZIO's interstate prices.  Accordingly, the Defendant's

motion to dismiss is **GRANTED**.

### A.        The Alleged Direct Control of Interstate Pricing

As the Court's ruling on the previous motion to dismiss noted, VIZIO has leave to amend

its complaint only to the extent of "add[ing] factual allegations from which the Court could

reasonably infer that the National Market Share provision of the E-waste law has the practical

effect of directly controlling the interstate prices of its televisions" to make out a claim under the

extraterritoriality theory of the dormant Commerce Clause.  *Vizio*, 2016 WL 1305116, at *15.

"[A]llegations showing that the E-waste law merely affects that prices charged by Plaintiff will

not suffice" to make out such a claim.  *Id.*  The Court also noted that *Grand River* "does not

stand for the proposition that the mere use of the phrase 'national market share' allows a dormant

Commerce Clause claim to survive a motion to dismiss."  *Id.* at *10.

VIZIO, therefore, must plead factual allegations plausibly showing "that the E-waste

Law's use of National Market Share data somehow directly controls prices in transactions

occurring wholly outside" Connecticut.  *Vizio*, 2016 WL 1305116, at *11.  Because VIZIO fails

to allege facts that plausibly support the claim that the E-Waste Law directly controls interstate

prices, the Amended Complaint fails to state a claim for violation of the dormant Commerce

Clause under the extraterritoriality theory.

Many allegations raised in Plaintiff's Amended Complaint do not relate to the E-Waste Law's alleged direct control on interstate prices.  The Court's previous order only allowed VIZIO to plead factual allegations supporting the argument that the E-Waste law directly controls interstate prices under the extraterritoriality theory of the dormant Commerce Clause. *Vizio*, 2016 WL 1305116, at *15.  Certain allegations in the Amended Complaint are irrelevant to this theory. For example, VIZIO alleges that the Connecticut E-Waste program is "fail[ing] to further any health or safety interest" because the electronics brought in for recycling are stockpiled rather than recycled.  Amend. Compl. ¶ 68.  To the extent that certain allegations in the Amended Complaint do not support the theory that the E-Waste Law directly controls VIZIO's interstate prices, the Court does not consider them.  *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." (internal quotation marks omitted)); *Ritani, LLC v. Aghjayan*, 970 F. Supp. 2d 232, 263 (S.D.N.Y. 2013) ("The law of the case mandates that a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." (internal quotation marks omitted)).

As Plaintiffs argue in their opposition to Defendant's renewed motion to dismiss, the Amended Complaint's primary theory alleging that the E-Waste Law's National Market Share provision directly controls VIZIO's interstate pricing is a simple one: if VIZIO lowers interstate prices, the resulting increase in its National Market Share will increase its costs under Connecticut's E-Waste Program, forcing VIZIO to bear a larger proportion of the costs of recycling televisions in Connecticut.  See Pl. Br. at 4-6, ECF No.  53; *see also* Amend. Compl. ¶¶ 54-57, 67, 70-74.  Specifically, VIZIO alleges that, as a low average-cost producer whose low

costs allow it to set low prices for its televisions in the highly competitive television market, it and other low average-cost producers "inevitably" set the overall minimum market price for televisions.  Amend. Compl. ¶¶ 51-53.  Because a television producer's costs under the E-Waste Law are based on its national market share, those costs allegedly put a "grossly disproportionate" burden on low average-cost producers that have substantial National Market Share due to low prices.  *Id.* ¶¶ 55-57.  By causing low-average cost producers' costs to increase, the National Market Share provision allegedly forces such producers to increase their prices.  *Id.*

Plaintiff's new allegations, however, merely "support an inference that the costs imposed by the E-waste Law have reduced Plaintiff's profit margins and created economic pressure to raise its prices nationwide to offset those losses."  *Vizio*, 2016 WL 1305116, at *11.  As this Court previously noted, such allegations describe "mere upstream pricing impact," which courts uniformly reject as a basis for dormant Commerce Clause extraterritoriality claims, "even if the impact is felt out-of-state where the stream originates."  *Freedom Holdings II*, 624 F.3d at 67; *see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 111 (2d Cir. 2001) ("*NEMA*") (finding no Commerce Clause violation though "it is axiomatic that the increased cost of complying with a regulation may drive up the sales price of the product"); *EELI*, 793 F.3d at 1173-74 ("We readily recognize that state regulations nominally concerning things other than price will often have ripple effects, including price effects, both in-state and elsewhere. . . . Still, without a regulation more blatantly regulating price and discriminating against out-of-state consumers or producers, *Baldwin* 's near *per se* rule doesn't apply.").

At oral argument, Plaintiff argued that the *Healy* line of cases should be read as prohibiting more than just statutes that directly regulate prices based on pricing in other states.  Specifically VIZIO argues that *Healy* "stand[s] at a minimum for . . . propositions" that are

broader than the simple prohibition, under the dormant Commerce Clause, on statutes that directly regulate prices in state based on out of state pricing.  *See* Pl.'s Br. at 8 (quoting *Healy*, 491 U.S. at 336).  The relevant portion of *Healy*, however, also reads that "a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states" and that the "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Healy*, 491 U.S. at 336 (internal quotation marks omitted). This language emphasizes that, in order for a statute to actually violate the dormant Commerce Clause under the extraterritoriality theory, it must directly control interstate prices.

Furthermore, the Supreme Court has noted that *Healy* and *Baldwin* do not prohibit statutes that "do[] not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003). *Healy* therefore did not apply to prohibit a statute that "does not insist that manufacturers sell their [product] . . . for a certain price" or "t[ie] the price of its in-state products to out-of-state prices." *Id.* (discussing state statute providing that if a prescription drug manufacturer does not enter into a rebate agreement with the state then its Medicaid sales would be subject to prior authorization from state agencies).  Courts recognize that "the mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Freedom Holdings II*, 624 F.3d at 67 (citing *Osborn v. Ozlin*, 310 U.S. 53, 62 (1940)).

VIZIO's Amended Complaint raises other allegations, such as the allegation that the Connecticut E-Waste Law was intended to be "part of a 'compact' among New England states" that would enact similar statutory schemes "in order to control interstate television prices" and "ensur[e] that television prices would be uniform across New England," but does not specifically

allege which other states have enacted similar statute or which provisions of these statutes "control" interstate prices and how they do so.  Amend. Compl. ¶ 64.  As discussed below in relation to how this case can be distinguished from *Grand River*, these allegations are also insufficient to support a theory that the E-Waste Law directly controls Plaintiff's interstate prices.

## B.        Distinguishing *Grand River*

The Second Circuit's holding in *Grand River*, controlling precedent on this Court, recognized that it could be possible to state a Dormant Commerce Clause extraterritoriality claim capable of surviving a motion to dismiss when challenging a statute that did not directly use interstate prices to regulate in-state pricing.  *See Grand River*, 425 F.3d at 173 ("Accordingly, appellants have successfully stated a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions. We cannot say at this early stage of the litigation on a motion to dismiss that the Statutes' practical effect is solely intrastate.").

As the Court's prior order explained, *Grand River* could be distinguished from this case, as pled in the original complaint, in four ways.  *Vizio*, 2016 WL 1305116, at *10-12.   VIZIO's amended complaint would need to address these four concerns and plead facts from which the Court could infer that the E-Waste Law's National Market Share provision "has the practical effect of directly controlling the interstate prices of its televisions."  *Id.* at *15.

The challenged policy in Grand River was part of a multi-state regulatory scheme governed by a master settlement agreement ("MSA"), between forty-six states and several major tobacco companies, and various states' statutes, known as Escrow Statutes and Contraband

20

Laws.  *See Grand River*, 425 F.3d at 163-64 ("It is undisputed that the Escrow Statutes are an integral part of the nationwide settlement effected by the MSA. In order to facilitate passage of these Escrow Statutes, the majors and the states specifically negotiated in New York model escrow legislation that was ultimately included in the MSA's appendix. Each of the defendants' states independently enacted Escrow Statutes that are substantially identical to that suggested in the MSA.").  The MSA required tobacco companies that were original participating manufacturers ("OPMs") at the inception of the agreement, or subsequent participating manufacturers ("SPMs") that joined the agreement at a later date, to pay the states agreed-upon amounts for health costs incurred by the states to treat smoking-related illnesses.  *See id.* Tobacco companies that were non-participating manufacturers ("NPMs") or non-parties to the MSA were required to either join the MSA or pay into escrow accounts.  *See id.*

Under the Escrow Statutes, NPMs that did not join the MSA were obligated to "establish and fund an escrow or reserve account" with a "per-cigarette amount" that was "roughly equal to what an OPM or SPM would pay under the MSA."  *Grand River* 425 F.3d at 163.  The Contraband Statutes, which were also enacted after the various states' enactment of the Escrow Statutes, required all non-OPM tobacco companies to certify annually that they were either SPMs or "making escrow deposits as an NPM," with non-compliance penalized "by denying a tax stamp," "thereby prohibiting the sale of cigarettes in that state" by any non-complying manufacturer.  *Id.* at 64.

### 1.    The Regulatory Scheme And the Pricing-Parity Context

The *Grand River* holding was premised partially on the recognition that the state statutes at issue had been enacted in the "pricing-parity context."  *Grand River*, 425 F.3d at 171.  The *Grand River* plaintiffs had alleged that the Escrow Statutes and Contraband Statutes, enacted

across the various states, "together establish an interdependent and interconnecting system of regulation, the practical effect of which is to set uniform (higher) prices nationwide." *Id.* As the Court noted when discussing the previous motion to dismiss in this case, the *Grand River* statutes were specifically intended to prevent NPMs from charging lower prices than companies that were participants of the MSA.

As the Defendant argues in the current motion to dismiss, the Plaintiff's Amended Complaint does not allege that the E-Waste Law was intended to, or has the effect of, causing certain television manufacturers to raise their prices to be more in line with the prices of other manufacturers nor to standardize prices nationwide. Def. Br. at 15. Instead, with respect to the alleged pricing parity purpose of the E-Waste Law, the Amended Complaint alleges only that Connecticut legislators hoped to prevent manufacturers from passing on the costs of the E-Waste Law to Connecticut consumers, have the E-Waste program be free of cost to Connecticut consumers, and that there may be "costs somewhere" that "someone [else] will pay. Amend. Compl. ¶¶ 59-62.

Plaintiff also alleges that it and similar low average-cost producers may be forced to raise their prices, which will set a new "minimum price floor" that causes other, higher-cost television manufacturers to also raise their prices. Amend. Compl. ¶ 57. Even accepting these allegations as true and drawing all inferences in favor of Plaintiff, *Ashcroft*, 556 U.S. at 678-79, these allegations fall short of alleging that the E-Waste Law was designed to standardize prices nationwide or to force certain manufacturers to standardize their prices relative to other manufacturers. *See Grand River*, 425 F.3d at 171. Plaintiff therefore does not allege that the Connecticut E-Waste Law was enacted in the pricing parity context, and *Grand River* is inapplicable.

### 2.     The Absence of Essentially Identical Statues in Other States

*Grand River* also involved a situation where a large number of states had enacted "essentially identical" statutes.  *Grand River*, 425 F.3d at 171.  As the *Grand River* court noted, the plaintiff had alleged that "the aggregate effect of the thirty-one states' Escrow Statutes," combined with the MSA, was to "short-circuit normal pricing decisions by effectively regulating the pricing mechanism for goods in interstate commerce."  *Id.* at 172 (internal quotation marks omitted).  The underlying MSA and statutory scheme in Grand River involved forty-six states that were party to the MSA.  *See Grand River*, 425 F.3d at 163-64.  In this case, there are no allegations that nearly as many states have enacted identical statutes.

The allegations in the Amended Complaint do not remotely resemble the allegations in *Grand River*, where at least thirty-one states had enacted essentially identical statutes.  In terms of allegations regarding other states' E-Waste laws, the Amended Complaint states only the following.  First, Connecticut is allegedly "one of eleven states that have enacted" a provision similar to the National Market Share provision.  Amend. Compl. ¶ 58.  This allegation falls short of stating that the other states have identical or essentially identical E-Waste laws.  Second, VIZIO alleges that the Connecticut legislature intended the E-Waste law to be "part of a 'compact' among New England states that would enact similar statutory schemes."  *Id.* ¶ 64; *see also id.* ¶¶ 29-30.  VIZIO does not, however, provide specific allegations as to how many states participate in this compact or to the extent these states' statutes are identical or essentially identical to Connecticut's.  Thus, the Amended Complaint does not support the inference that the E-Waste Law is part of a multi-state regime involving "essentially identical" statutes that have an aggregate effect of controlling interstate prices.  *Grand River*, 425 F.3d at 171.

Furthermore, the Amended Complaint recognizes that many states, in fact, have enacted substantially different e-waste laws, and that many states do not measure manufacturers' obligations using a provision similar to Connecticut's National Market Share provision.  The Amended Complaint explains that twenty-four other states "regulate e-waste and most use some form of sales data as the basis for allocating recycling obligations," but that these different states' e-waste laws differ in their "use of sales data."  Amend. Compl. ¶ 41.  Some states, such as New Hampshire, have "chosen not to regulate e-waste."  Id. ¶ 42.  Finally, different states' e-waste programs "conflict in various other ways" and impose "inconsistent" obligations, and design their e-waste programs differently, with some states "assign[ing] allocations based on television units returned for recycling rather than sales."  *Id.* ¶ 43.

### 3.	Facts Allegedly Showing Challenged Statute Directly Regulates Price

Additionally, the complaint in *Grand River* alleged enough facts for that court to reasonably infer that the challenged laws acted to regulate the price of cigarettes directly.  *See Grand River*, 425 F.3d at 171-72; *see also* Compl., ECF No. 1, *Grand River, et al. v. Pryor, et al.*, No. 1:02-cv-5068 (S.D.N.Y. Jul. 1, 2002) ("Grand River Compl.").  VIZIO does not allege facts analogous to the key facts in the *Grand River* complaint.  *See Vizio*, 2016 WL 1305116, at *11 (listing relevant paragraphs of the *Grand River* complaint).

Among other factual allegations, the *Grand River* plaintiffs alleged that "the purpose of the Escrow Statutes (and their Contraband Law counterparts), as described in the MSA, was and is to effectively and fully neutralize the cost disadvantages that the MSA's [OPMs] experience vis-à-vis [NPMs]," in other words, to limit price competition that OPMs "would otherwise face from NPMs when the [OPMs] raised their prices to fund their settlement payments to the States under the MSA."  Grand River Compl. ¶ 5.  Because the OPMs allegedly raised the concern

regarding losing market share during the negotiation of the MSA, the MSA and the surrounding statutory scheme allegedly took into account the goal of protecting the OPMs' market share. *Id.* ¶ 71, 84, 90. The Grand River plaintiffs also alleged that the OPMs had not lost significant market share, having gone from "98% of sales in the domestic cigarette market" in 1999 to "a combined market share of 93.6%" for the first six months of 2001, despite having increased their prices by 60% since the MSA. *Id.* ¶ 108. As discussed above, with respect to the Connecticut E-Waste Law not having been enacted in the pricing parity context, VIZIO does not allege facts sufficient to show that the E-Waste Law has the effect of setting uniform prices nationwide.

The *Grand River* plaintiffs further alleged that the Escrow Statutes operated to base NPM escrow payments directly on the amount that a NPM would pay as settlement payments were they an OPM or SPM, which forced an increase in price for the NPM's cigarettes equivalent to the price increase that would have resulted from making such settlement payments. *See* Grand River Compl. ¶¶ 5, 8, 70, 73-74, 87, 99, 115. An OPM or SPM's settlement payments were also based, in part, on the OPM or SPM's national market share, thus an NPM's escrow payments were also tied to the NPM's national market share. *See id.* ¶¶ 70, 73, 99-101, 128. NPMs were, under the Escrow Statues, allegedly obligated to make escrow payments of "more than $3.00 per carton" for the current year and similar payments for prior years' sales, which exceeded the *Grand River* plaintiffs' net profits per carton. *Id.* ¶ 115. The plaintiffs therefore alleged that the challenged statutes would either put them out of business or force an increase in prices on their products that "would destroy their ability to compete" against OPMs and SPMs. *Id.* As discussed below with respect to how VIZIO's allegations relate to upstream pricing impacts that merely affect, rather than directly control, the prices VIZIO may charge, VIZIO fails to allege facts analogous to those in the *Grand River* complaint.

### 4.    Statute Allegedly Preventing Plaintiffs from Passing Costs to In-State Consumers

Finally, as the Court noted in its order on the previous motion to dismiss, the E-Waste Law does nothing to prevent VIZIO from imposing the costs of the E-Waste Law directly on its Connecticut consumers instead of extending price increases nationwide. *See Vizio*, 2016 WL 1305116, at *12; *see also Freedom Holdings II*, 624 F.3d at 66 (affirming judgment that there was no Commerce Clause violation because "nothing prevents manufacturers from recouping increased costs imposed by New York law from New York consumers."); *NEMA*, 272 F.3d at 110 (finding no dormant Commerce Cause violation where "the manufacturers remain free to charge higher prices only to Vermonters without risking violation of the statute").  While VIZIO alleges that it cannot, in practical terms, impose the costs of the E-Waste law solely on Connecticut customers, the statute does not prohibit it.

As Defendant argues in his current motion to dismiss, based on the allegations in the Amended Complaint, nothing in the text of Connecticut's E-Waste law prevents VIZIO from imposing the costs directly on to its Connecticut customers.  Def. Br. At 16.  The Amended Complaint alleges that VIZIO cannot impose the costs of the E-Waste Law solely on Connecticut in-state consumers for the following reasons.  First, VIZIO alleges that if it begins raising prices solely for Connecticut consumers, its sales to Connecticut consumers would decrease while the National Market Share-based costs of the E-Waste Program would remain high because Connecticut is too small a market to impact VIZIO's National Market Share significantly, necessitating the continuing increase of Connecticut prices until no sales to Connecticut in-state customers would be possible.  Amend. Compl. ¶¶ 72-73. Second, VIZIO alleges that, as a practical matter, its buyers would not enter into sales contracts with VIZIO that either (a) force

the buyer to sell the televisions at a minimum price or (b) restricts or blocks the sale of VIZIO televisions in Connecticut.  *Id.* ¶ 74.

The Second Circuit rejected this argument in *NEMA*, noting that even if "the increased cost of complying with a regulation may drive up the sales price of the product and thus erode demand . . . such that production becomes unprofitable," the "decision to abandon the [regulating] state's market rests entirely with individual manufacturers based on the opportunity cost of capital, their individual production costs, and what the demand in the state will bear." *NEMA*, 272 F.3d at 111.  As the larger market variables that VIZIO points to are not "controlled by the state," the Court "cannot say that the choice to stay or leave has been made for manufacturers by the state legislature."  *Id.*

The E-Waste Law, therefore, is unlike the statutes the Supreme Court invalidated in the *Healy* line of cases, which explicitly required that the price of a product in a state be no higher than the price for that product in other states and necessarily prevented manufacturers from imposing the costs on customers in the state that passes such a statute.  *See Healy*, 491 U.S. at 339; *Freedom Holdings II*, 624 at 66 (distinguishing statute from *Healy*).  Thus, the allegations in the Amended Complaint do not support an inference that the E-Waste Law prevents VIZIO from imposing costs directly on Connecticut consumers, which, in turn, undermines the allegation that the E-Waste Law controls interstate pricing.

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's renewed motion to dismiss, ECF No. 44, and dismisses Plaintiff's Amended Complaint, ECF No. 41, with prejudice.

Consistent with the analysis above, the Court finds that, even if given the opportunity to amend the complaint further, Plaintiff will not be able to allege facts showing that the E-Waste

Law directly controls Plaintiff's interstate prices, which is required for Plaintiff to be able to state a claim.  Thus, dismissal with prejudice is appropriate.  *See Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 368 (2d Cir. 2014) ("Finally, Plaintiffs contend that the district court abused its discretion in dismissing their claims with prejudice. We disagree. Plaintiffs have identified no facts that, if alleged, would establish a valid claim. The district court therefore did not abuse its discretion because any amendment . . .  would be futile." (internal citations omitted)).

The Clerk of the Court is directed to close this case.

SO ORDERED at Bridgeport, Connecticut, this 22nd day of December, 2016.

      /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge